309 F.2d 248
 Peter CALAGAZ, on Behalf of Himself and All Other Members of
Marine Engineers' Beneficial Association No. 14,
AFL-CIO, Mobile, Alabama, Appellant,
v.
Jesse M. CALHOON and Julius Dembicki, Appellees.
Peter CALAGAZ, on Behalf of Himself and All Other Members of
Marine Engineers' Beneficial Association No. 14,
AFL-CIO, Mobile, Alabama, Appellant,
v.
W. G. KELLOGG, Individually, as Agent, etc., et al., Appellees.
 Nos. 19293, 19417.
 United States Court of Appeals Fifth Circuit.
 Oct. 10, 1962.
 
 Willis C. Darby, Jr., Mobile, Ala., for appellant.
 Otto E. Simon, Mobile, Ala., Lee Pressman, New York City, for appellees.
 Before CAMERON, WISDOM and GEWIN, Circuit Judges.
 WISDOM, Circuit Judge.
 
 
 1
 These appeals[1] concern a class action by members of a local unincorporated association against the members of a national unincorporated association. Jurisdiction is asserted on the ground of diversity of citizenship. The district court dismissed the complaint for lack of jurisdiction and insufficiency of service of process. We reverse and remand.
 
 
 2
 The plaintiff, Peter Calagaz, filed a class action on behalf of himself and all other members of the Marine Engineers Beneficial Association No. 14 (Local No. 14), an unincorporated association having its sole office in Mobile, Alabama. He sued W. G. Kellogg, individually, as agent of the National Marine Engineers Beneficial Association, AFL-CIO (MEBA), an unincorporated association, as Executive Vice President of the National MEBA, and as representative of al other members of a class designated as the National MEBA. MEBA has its head offices in Washington, D.C. and New York City. Local No. 14 is, or was, a subordinate association of the Gulf Coast District of the National MEBA. In January 1961, after a national convention and referendum by mail, MEBA was reorganized by the substitution of three districts to replace five districts and subordinate associations. The complaint challenges the legality of the national convention, the validity of the referendum, the honesty of the ballot count, and a number of other acts all related to the reorganization. Calagaz complains that Kellogg and other officers and members of National MEBA conspired to destroy Local No. 14, arbitrarily and illegally, taking over its members and, importantly, the dues the local would otherwise receive, and other assets. The complaint states that the defendants pressured members of Local No. 14 to change their membership to District No. 1, instructed steamship companies not to accept members of Local No. 14 for employment, wrongfully induced former members of Local No. 14 to bring suit tying up the Local's assets, and operated an office in Mobile for the specific purpose of carrying out National's plan to destroy Local No. 14. The plaintiff asks for a declaratory judgment, and for an injunction.[2]
 
 
 3
 From the outset jurisdictional difficulties have plagued the plaintiff. Kellogg, National's Executive Vice President, opened an office in Mobile which he administered through Paul Story. Calagaz obtained service of process on Story as Kellogg's agent. Three days later Kellogg died. His death left the plaintiff suing a class, none of whose representatives was before the court. The plaintiff then amended his complaint to substitute as representatives of the defendant class J. M. Calhoon, Secretary-Treasurer of National, and Robert L. Merrick, a member of National and Secretary-Treasurer of Atlantic and Gulf Coast District No. 1. Later, he amended his complaint by adding E. N. Altman, President of MEBA, and certain other officers and members of National as class representatives. The defendants were served in accordance with the Alabama substituted service law.[3]
 
 I.
 
 4
 The defendants' first contention is that the plaintiff fails to allege and show diversity of citizenship: in a diversity suit against an association the citizenship of the individual parties must be shown and must be wholly diverse from that of the opposing parties.
 
 
 5
 The dead hand of the common law still holds unincorporated associations in its grip. Doctrinally, an association has no legal existence as an entity separate from its members. It is still the law that an unincorporated association is not a jural person for purposes of diversity jurisdiction, even when it has the capacity to sue or be sued in the association name. Lowry v. International Brotherhood, Etc., 5 Cir., 1958, 259 F.2d 568; Hettenbaugh v. Airline Pilots Ass'n International, 5 Cir., 1951, 189 F.2d 319. If the doctrine were carried to its logical extreme, unincorporated associations would enjoy virtual immunity from suit in federal courts. To prevent a failure of justice, the courts recognize litigating capacity in an association when it sues or is sued in a class action under Rule 23(a). 'We know of no practical reason why the procedure prescribed by Rule 23(a)(1) should not be as fair and as effective in enabling unincorporated associations to sue or be sued as is the procedure-- which prevails in many jurisdictions-- of permitting them to sue or defend under their common names. Where such associations have the status of legal entities, the members who act for them in bringing or defending actions are in reality the representatives of the membership as a whole.' Montgomery Ward & Co. v. Langer, 8 Cir., 1948, 168 F.2d 182, 187. Rule 17(b) is no obstacle to class actions. In Lowry v. International Brotherhood of Boilermakers, 5 Cir., 1958, 259 F.2d 568, 672-673, this Court quoted with approval Judge Parker's explanation of the interaction of Rule 17(b) and 23(a):[4]
 
 
 6
 'And there is nothing in rule 17(b) which limits the right to bring a class suit under rule 23(a) in proper cases. Rule 17(b) relates to capacity to sue or be sued; and it provides that, where a partnership or unincorporated association has no such capacity by the law of the state where the court is held, it may nevertheless sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States. There is nothing in this that limits the right to bring the unincorporated association into court by means of a class suit in accordance with the prior practice; and the right to bring such class suit continues to be of great value when the right to sue the association in its common name is, for any reason, unavailable. Instances where it is not available are cases where jurisdiction based on diversity would be defeated by a suit by or against the association but not by a suit by or against representatives or where, as here, it is not possible for the plaintiff to serve process on the association within a convenient jurisdiction. * * * Together (Rule 17(b) and 23(a)) provide alternative methods of bringing unincorporated associations into court.' Tunstall v. Brotherhood of Locomotive Firemen and Enginemen, 4 Cir., 1945, 148 F.2d 403, 405.
 
 
 7
 In a class action under Rule 23(a) diversity is determined by the citizenship only of the named representatives. Here, the representatives sought to be joined as party defendants are admittedly not citizens of Alabama, where Calagaz resides.
 
 
 8
 The defendants do not contest these general statements of the law; they say that the plaintiff named National as a party defendant. If it were sued as an entity, the suit would have to be dismissed for lack of jurisdiction. The plaintiff denies any intention of making National a party defendant. The case appears to us to be a typical class action. The complaint starts off by alleging that the reason for not joining all members of Local No. 14 as plaintiffs is that they number in excess of two hundred; and the reason for not joining all members of MEBA is that they number approximately froty. The complaint states that it is impracticable to bring them before the court; these men, of course, were marine engineers. Nowhere is MEBA expressly described as a defendant. The individuals are described as 'representative(s) of all other members' of MEBA. The individual defendants are also referred to as 'Agent' and 'Vice-President', but these terms appear to be only descriptive and for the purpose of showing that the defendants are fair representatives of the class. In Lowry, on the other hand, the defendant union was sued as 'de jure person and, without further description as to whether or not it was incorporated'.
 
 
 9
 Courts have considerable latitude in handling class actions. In Lowry we said:
 
 
 10
 'It has even been held, where the unincorporated association was a party in its own name and also as a class and where the state did not allow suits against associations as such, that the entity will be disregarded under Rule 17(b) and the case will be treated as a class action. (Tunstall v. Brotherhood of Locomotive Firemen and Enginemen, 4 Cir., 1945, 148 F.2d 403) Or, whether or not the state allows suits to be commenced in the entity name, the courts have allowed a dismissal of the entity in order to create diversity in a class action. (Montgomery Ward & Co. v. Langer, 8 Cir., 1948, 168 F.2d 182, 187)' 5 Cir., 259 F.2d 568, 573
 
 
 11
 Considering the pleadings and the record, we think that the suit should properly be regarded as an action against named individuals and as a class action.
 
 II.
 
 12
 Rule 23(a) is a convenient procedural device that keeps a plaintiff from being disabled by the weight of numbers. It does not change jurisdictional requirements. Here, the court must still have in personam jurisdiction over the named individual representative of the class. The plaintiff relies upon two different theories, one supporting jurisdiction over Altman, the other supporting jurisdiction over certain officers of National: Calhoon, Dembicki, Rowell, Merrick and Rogers.
 
 
 13
 To support jurisdiction over Altman, the plaintiff argues that the death of Kellogg, the class representative, did not terminate the action; rather, once the defendants had been brought in as a class through service on their representative, in personam jurisdiction attached to all other members of the class so that the plaintiff could substitute the successor in office or interest of the deceased representative.[5] Alternatively, the plaintiff suggests that the action may be maintained against the class without substitution. He argues that if service upon Kellogg, National's Executive Vice President, was sufficient to give notice to the entire class of the pending suit, then that notice still stands even after his death; that the class is still before the court, and that the action can be prosecuted against it. There are several flaws in this line of argument.
 
 
 14
 The theory of the class action is that all the members of the class are before the court in the person of their representatives; and, therefore, can justly be bound by the court's decree. The class must, however, be adequately represented, for it is only through the self-interest of their representatives that adequate litigation of the common issues is assured. See Note, Binding Effect of Class Actions, 67 Harvard Law Review 1059 (1954). An adequate litigation of issues in all fairness binding on the class is not assured if no living member of the class is served with process that will bring in a representative to defend the action. In this respect, therefore, our case differs from that postulated by the plaintiff in which the representative party defendant died after both parties had rested and the court had taken the case under submission. In such a situation, where there has been an adequate defense of the class's interests, it might well be true that the action would not terminate upon the death of the named representative, and that the judgment therein rendered would be 'absolutely binding and res judicata as to all members.' That, however, is not our case. Here the death of the representative occurred at the outset; when he died there was no one to defend the interests of the class. See Edwards v. Mercantile Trust Co., S.D.N.Y.1903, 121 F. 203.
 
 
 15
 Nor can we say that because of the original service on Kellogg the plaintiff now may substitute an appropriate representative from the remaining members to take his place. A court in Alabama would ordinarily have no basis for in personam jurisdiction over Altman. He is not a resident of that state and does not appear to have performed any activity therein. It is one thing to say that a judgment is binding upon all the members of the class; it is an entirely different thing to say that in personam jurisdiction attaches to all members of the class once such jurisdiction had been acquired over one member and service of process has been made upon him. Individual members of the class are before the court only as far as they are class members; in personam jurisdiction does not automatically attach to each member once a suitable representative has been properly served. Indeed, if the plaintiff's contention were true, diversity of citizenship, which is the only basis for federal jurisdiction of this complaint, would be destroyed, since some members of the class sued are apparently residents of Alabama.
 
 
 16
 The plaintiff, therefore, can remain in court only if there is some basis for finding in personam jurisdiction over the other named defendants.
 
 III.
 
 17
 A. In order to determine whether the district court had jurisdiction over Calhoon, Dembicki, Rowell, Merrick, and Rogers as individuals and as representatives of their class, we must first decide if the 'minimum contacts' test enunciated in International Shoe Co. v. Washington, 1945, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, applies to natural persons as well as to corporations. The broad language of the opinion indicates that it does. Thus the Court stated:
 
 
 18
 'Historically the jurisdiction of courts to render judgment in personam is grounded on their de facto power over the defendant's person. Hence his presence within the territorial jurisdiction of a court was prerequisite to its rendition of a judgment personally binding him. Pennoyer v. Neff, 95 U.S. 714, 733, 24 L.Ed. 565. But now that the capias ad respondendum has given way to personal service of summons or other form of notice, due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' * * * Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. That clause does not contemplate that a state may make binding a judgment in personam against an individual or corporate defendant with which the state has no contacts, ties, or relations.' 326 U.S. at 316 and 319, 66 S.Ct. at 158, and 159.
 
 
 19
 Moreover, the Court supported its reasoning by reference to cases, such as Hess v. Pawloski, 1927, 274 U.S. 352, 47 S.Ct. 632, 71 L.Ed. 1091, and Milliken v. Meyer, 1940, 311 U.S. 457, 61 S.Ct. 339, 85 L.Ed. 278, in which the defendants were natural persons. Indeed, it would seem that the same considerations of fairness and the nature of the defendant's activity in the state which are utilized in determining jurisdiction over corporations should be equally applicable when the defendant is a natural person. The 'quality and nature' of the activities control, not the number of the acts nor mechanical standards. When a complaint alleges injury to a local association including possible seizure of its assets, it is analogous to an action to recover for injury to a person or damage to property within the state for acts of the defendants, some of which may have taken place outside of the State. When the acts take effect within the state of the forum, it would seem fair and reasonable for that State to open its courts to its aggrieved citizen whether the alleged wrong was committed by a real or fictitious person. See Foster, Personal Jurisdiction Based on Local Causes of Action, 1956 Wis.L.Rev. 522, 544; Developments in the Law-- State Court Jurisdiction, 73 Harvard Law Review 909, 935-37 (1960); Sobeloff, Jurisdiction of State Courts Over Non-Residents in Our Federal System, 43 Cornell L.Q. 196 (1957).
 
 
 20
 B. Can it be said that any of the individual defendants named by plaintiff have personally had such 'minimum contacts' with the State of Alabama on behalf of the class which they represent that 'the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice" or make it unreasonable 'in the context of our federal system of government' to require them 'to defend the particular suit which is brought there'? Two of the defendants, Merrick and Rogers, are not shown to have transacted any business whatsoever in Alabama or have had any personal contact with the state. Indeed, their only connection with this suit is that both are officers of National and its new subdivision, Atlantic and Gulf Coast District No. 1 The contacts of Rowell and Dembicki with the state are equally tenuous. Rowell, an officer in charge of National's Gulf Branches, which would include, of course, Mobile, Alabama, is alleged to have solicited members of Local No. 14 to bring suit in Mobile against the Local's officers. This solicitation, however, if it occurred at all, took place in New Orleans. And, except for his presence during the negotiation of a contract between National and the Keva Corporation, which took place in Mobile on June 15, 1960, Rowell is not shown to have had any other contacts with Local No. 14 or with Alabama. Dembicki is the Third Vice President of National. On February 3, 1961, in New York City he advised John Arnold, a member of Local No. 14, to transfer to the new District No. 1 and warned him that if he continued in Local No. 14, he might be 'pulled off the ships', since he would not then be a member of National in good standing; moreover, he would not be credited with the dues which he had paid to the Local. There is no showing that Dembicki performed any other acts relating specifically to Local No. 14 or to Alabama.
 
 
 21
 The plaintiff must show that these defendants personally transacted business in Alabama on behalf of National. This he has failed to do. The isolated and sporadic activity which these four defendants performed in or directed toward Alabama do not rise to the dignity of 'doing business' therein. What few specific acts are alleged to have been done were carried on outside the State of Alabama. The 'estimate of the inconveniences' which would result to the defendants from a trial away from their state of residence is relevant here. International Shoe Co. v. Washington, 1945, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95; Green v. U.S. Chewing Gum Mfg. Co., 5 Cir., 1955, 224 F.2d 369. We cannot say on the strength of the record before us that the activity of these four defendants within Alabama has been of such a nature and quality as to justify an extension of that state's jurisdiction over them.
 
 
 22
 C. Calhoon presents a different case. As Secretary-Treasurer of National MEBA, he collected National's per capita tax of $2.50 per month for each member of Local No. 14. Thus, in 1959 he received $6,053.15 from the Mobile organization; in 1960 he received $5,058.40. More important, he was in charge of National's contracts. The national organization maintained collective bargaining agreements with three steamship companies located in Mobile, the Waterman Steamship Corp., Keva Corp., and Mississippi Valley Barge Line Company. In December 1959 Calhoon participated in negotiations, held in Mobile, with the Mississippi Valley Barge Line, and subsequently engaged in an extensive correspondence with all three.
 
 
 23
 January 3, 1961, Calhoon wrote to these companies advising them that all ports in the Atlantic and Gulf District would be administered through port agents of the district and gave detailed directions as to the procedures to be established in Mobile. The port agent's office was to be notified a day in advance of 'the date, time and place of payoff of all company vessels'; three copies of voyage schedules of ships engaged in coast-wise or nearby foreign trade were to be sent to the district office; and parking space was to be provided at the place of pay-off for MEBA's patrolmen. There was, according to Calhoon's testimony, an agent in Mobile to administer this policy. About two months later, Calhoon wrote the same three companies that the administration of National's collective bargaining agreements in Mobile would thenceforth be directed by William G. Kellogg, who had already established offices there. Clearances from the local organization, required by the bargaining agreement, would be given by Kellogg; any questions with respect to Kellogg granting clearances were to be directed to Calhoon personally. March 31, Calhoon sent a telegram to the Waterman Steamship Company in connection with a violation of their collective bargaining agreement. On April 11 he again wrote to all of the Mobile firms with which National MEBA had contracts, directing the companies not to request the Local's union hall for night relief engineers and instructing them to obtain replacements for reqular engineers in New Orleans. In accordance with these instructions, the seamship companies in Mobile refused to accept any men from Local 14 for work.
 
 
 24
 Since Travelers Health Ass'n v. Virginia, 1950, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154, and McGee v. International Life Insurance Co., 1957, 355 U.S. 200, 78 S.Ct. 199, 2 L.Ed.2d 223, it is established that correspondence alone may establish sufficient contacts with a state to subject a nonresident to a suit in that state on a cause of action arising out of those contacts. These actions by Calhoon had the effect of causing the Mobile steamship companies to refuse employment to Local No. 14 members; and, according to the allegations of the complaint, this formed part of the conspiracy by National's officers to destroy Local No. 14. There is other substantial evidence of his 'doing business' there.
 
 
 25
 Calhoon was instrumental in opening the office in Mobile which took over the administration of National's policy there. February 17, 1961, he wrote to Kellogg on behalf of the National Administrative Committee authorizing him 'to take any and all steps which you may deem necessary to administer the National MEBA collective bargaining agreements within the Port of Mobile. * * *' March 7 he advised 'all steamship companies under contract to NMEBA' that Kellogg had 'established offices at 80 Saint Michael Street, Mobile, Alabama', and would handle all requests concerning night relief engineers. He further stated that any questions concerning administration of the collective-bargaining agreements in Mobile should be directed to him personally. According to their affidavits, D. J. Hueston and Wright Slaughter, both members and officers of Local No. 14, were told by Kellogg and by Paul Story that Story was working under Kellogg and would be in charge of the new National office in Mobile. Kellogg signed the lease for this office at 80 Saint Michael Street, and there were further sworn statements by Hueston that Story did, in fact, take charge of the office. Moreover, when Alvin Slay, a member of Local No. 14, applied to the MEBA Tanker Vacation Plan for a vacation claim, he was told that 'in Mobile, the person authorized to certify vacation applications is Mr. Paul Story, at the MEBA Hall,' and was given the address of the office which Kellogg had leased, 80 Saint Michael Street. In this connection it should be noted that Calhoon was Chairman and one of the four trustees who administered the MEBA Tanker Vacation Plan. He was also the person who countersigned Story's pay checks. When asked, who 'transmits to the MEBA Tanker Vacation Plan the authorization for people to sign for vacation relief?' Calhoon replied, 'That is the normal duty of the chairman or the secretary of the trustees of the Plans.' A further indication that Calhoon exercised direct responsibility for the operation and maintenance of National's office in Mobile is his letter of April 21, 1961, enclosing a month's rent, which he sent to the lessor.
 
 
 26
 In Underwood v. McBride, D.Del.1960, 182 F.Supp. 361, a local union sought equitable relief from action of the International Union in imposing a trusteeship upon it. Maloney, president of the International, had placed the local union under International supervision, and had appointed Wharton 'to administer the business and affairs thereof.' Wharton appointed Lavery as his agent, and Lavery, in turn, worked through McBride. Delaney then succeeded Wharton as president. The court stated that
 
 
 27
 'as far as concerns this State, the business of Local No. 542 and that of Delaney and Wharton are the same. McBride was appointed by Lavery, one of Wharton's agents. His very pay checks are signed by Wharton as Supervisor or Trustee of Local No. 542. * * * Clearly, he is an agent of and paid by Delaney and Wharton, the Trustees of Local No. 542. He is no mere clerk but a supervising agent whose work is coextensive with the work of International and Delaney and Wharton in this State. Under such facts, it comes with poor grace for the defendants to argue that because McBride was not directly appointed by Delaney (Maloney's successor or by Wharton, that he is not their agent.' 182 F.Supp. at 365.
 
 
 28
 Another case, Underwood v. Maloney, E.D.Pa.1953, 14 F.R.D. 222, arose out of similar action by the same International affecting a different local.
 
 
 29
 'Under the order of defendant Maloney invoking International supervision * * *, it would appear that defendant Maloney as President of the International Union personally took over the affairs of the Local and he appointed Wharton to act as his 'Deputy'. Since defendant Maloney was personally supervising the affairs of the Local, through his Deputy Wharton, he must be considered as doing business within the jurisdiction and service upon Wharton, his Deputy, was valid service upon defendant Maloney.' 14 F.R.D. at 225.
 
 
 30
 The principles relied on in these two decisions apply to this case. Calhoon's activities constitute sufficient 'minimum contacts' with the State of Alabama to subject him to the jurisdiction of courts sitting in that state.
 
 IV.
 
 31
 In order to acquire in personam jurisdiction over Clahoon, the plaintiff served him under Title 7, Section 199(1) of the Alabama Code, providing for service upon nonresidents doing business or performing work in the state: $510'Any non-resident person, firm, partnership, general or limited * * * not qualified under the Constitution and laws of this state as to doing business herein, who shall do any business or perform any character of work or service in this state shall, by the doing of such business or the performing of such work, or services, be deemed to have appointed the secretary of state, or his successor or successors in office, to be the true and lawful attorney or agent of such non-resident, upon whom process may be served in any action accrued or accruing from the doing of such business, or the performing of such work, or service, or as an incident thereto by any such non-resident, or his, its or their agent, servant or employee.'
 
 
 32
 Once service has been made upon the Secretary of State, he, in turn, must notify the defendant by registered mail or 'by causing or having a notice of such service and a copy of the process served upon such nonresident * * * by a * * * deputy United States Marshal. * * *'
 
 
 33
 The defendants contend that there were insufficient activities on the part of Calhoon within Alabama to constitute the doing of business. In particular, they rely upon New York Times Co. v. Conner, 5 Cir., 1961, 291 F.2d 492, in which this Court construed this same statute to apply only where a completed cause of action-- in that case an alleged libel published in New York-- arose from the acts done in Alabama. The Alabama Supreme Court has since held in an almost identical factual situation that 'when a nonresident prints a libel beyond the boundaries of the State, and distributes and publishes the libel in Alabama, a cause of action arises in Alabama, as well as in the State of the printing or publishing of the libel.' New York Times Co. v. Sullivan, Ala., 144 So.2d 25 (1962). See also Johnson Publishing Co. v. Davis, 1960, 272 Ala. 474, 124 So.2d 441. In Sullivan the Alabama Court quoted with approval language from WSAZ, Inc. v. Lyons, 6 Cir., 1957, 254 F.2d 242, 248: 'All that is necessary here is that the cause of action asserted shall be 'connected' with the business done. * * * While defendant was not present in the territory of the forum, it certainly had substantial contacts with it.'
 
 
 34
 The alleged wrong took place in Mobile, Alabama. The assets allegedly sought to be seized were in Mobile. Although Calihoon was in New York City when he mailed the letters instructing the steamship companies to cease using members of Local No. 14 on ships in Mobile, the injury to the local union occurred in Mobile itself when the companies refused to employ its members. In addition, the alleged illegality of National's new plan to do away with the local organizations did not give rise to a cause of action until steps were taken to carry out this new policy. These steps included, of course, opening the National office in Mobile and committing other acts directly related to carrying out the reorganization of MEBA.
 
 
 35
 In Lowry v. International Brotherhood of Boilermakers, 5 Cir., 1955, 220 F.2d 546, the plaintiff sued for wrongful suspension from the union. This Court held that the cause of action arose in Pascagoula, Mississippi, where the letter was received, rather than in Kansas, where it was mailed. We stated:
 
 
 36
 'It was the receipt of the letter in Pascagoula, Mississippi, that caused the alleged injury. The suspension and expulsion of the defendant was initiated by the president of the union in Kansas, but the wrong was not completed when the letter was mailed. The time when a cause of action arises and the place where it arises are necessarily connected, since the same act is the tortious event in each instance. The final act which creates the liability in a cause of action has both aspects of time and place. It occurs at a certain time and in a certain geographical spot. The letter had no effect upon the appellant until received by him in Mississippi; it was there that he was a member of the union, and it was there that the suspension took effect. His cause of action accrued in Mississippi, and should be governed by the laws of that state.' 220 F.2d at 548.
 
 
 37
 Similarly, the challenged acts of Calhoon had no effect upon the plaintiff in New York City; it was their effect in Mobile which gave rise to the cause of action.
 
 V.
 
 38
 The sufficiency of service of process in a class suit depends upon the likelihood of it giving adequate notice to the class sued to come in and defend. The person served must be fairly representative of the membership of the class and his 'character in relation to the association' must be such that 'it could be reasonably expected that he would give notice of the suit to his association.' Tunstall v. Brotherhood of Locomotive Firemen and Enginemen, 4 Cir., 1945, 148 F.2d 403, 406. See Acme Engineers, Inc. v. Foster Engineering Co., 5 Cir., 1958, 254 F.2d 259. There can be no question that Calhoon, and through him, the membership of National MEBA received notice of this suit. Calhoon refused to accept the summons sent by registered mail, under Title 7, Section 199(1) of the Alabama Code, although it admittedly bore the correct address. However, according to the sworn affidavits of Mrs. Nancy H. Turner, the Administrative Assistant to the Alabama Secretary of State, and of her secretary, Mr. Simon, defendants' Mobile counsel, asked that he be notified whenever service of process was made on the Secretary of State on behalf of any of his clients, and this notification was given to him. Moreover, service was had upon Calhoon in New York City by a deputy United States Marshal. Calhoon testified to the incident as follows:
 
 
 39
 '(The Marshal) met me in the corridor of the building (where National M.E.B.A. has its offices) on May 4th (1961). * * * As I came into the building (the Marshal) approached me and said, 'Are you Calhoon?' I said, 'No.' He pulled out some paper out of his pocket in a folder and said, 'I am a marshal. Are you Calhoon?' He said, 'I think you are Calhoon.' I continued walking into the low-rise elevator, which is to my left. He took hold of my arm, and I said, 'Let go of my arm' or 'Let go of me'-- something to that effect. I went into the elevator. After I got in the elevator, I guess it was half a minute or a minute before this gentleman appeared again, and he said, 'I think you are Calhoon,' and threw some papers on the floor of the elevator. The elevator took off.'
 
 
 40
 Later Calhoon went over these documents, which, according to his own testimony, were brought into his office. Process served upon Calhoon, the Secretary-Treasurer of National MEBA and Chairman of Atlantic and Gulf District No. 1, would constitute adequate notice to the class of which he is the representative.
 
 
 41
 There can be no doubt that actual notice was given to the class. As in Tunstall, 'this service, as a matter of fact, did bring the Brotherhood in, fighting.' Tunstall v. Brotherhood of Loomotive Firemen & Enginemen, 4 Cir., 1945, 148 F.2d 403. National MEBA is in and pulling no punches.
 
 VI.
 
 42
 Defendants contend that the complaint should be dismissed, because the plaintiff did not exhaust his internal remedies within the union. The plaintiff, however, alleged in his complaint that action to obtain relief through union procedures would be 'futile', because the individuals who were named as defendants and whose actions the plaintiff complains of, are officers of National and are in control of all channels of relief the plaintiff might have in the union. See Fingar v. Seaboard Air Line Railroad Co., 5 Cir., 1960, 277 F.2d 698, 701. The plaintiffs are not compelled to exhaust the internal remedies of their union when their appeal would have to be made to the very officers against whom their complaint is directed. Steele v. Louisville & Nashville Railroad Co., 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173.
 
 VII.
 
 43
 Finally, the plaintiff asks that this Court order an injunction to be issued. We have, however, already dealt with an identical request in a prior appeal of this case, Calagaz v. DeFries, 5 Cir., 1962, 303 F.2d 588. Our holding there still applies:
 
 
 44
 'There is no absolute standard by which the discretion of a trial judge is to be guided in determining whether to grant or deny a motion for a temporary or preliminary injunction. His task is to balance the relative conveniences of the parties. If he finds that certain, immediate, and irreparable injury to a substantial interest of the movant will occur if the application is denied and the final decree is in his favor, and that injury to the opponent will be inconsiderable by a bond, even if the final bya bond, even if the final decree be in his favor, an injunction should issue. The determination of these matters is to be made by the trial court, not by this one. * * * The acts alleged by appellant constitute no semblance of a showing of that character of certainty, immediacy, or irreparability of preponderating harm, hardship, or inconvenience, actual or threatened, required to warrant the issuance of an injunction (by this Court).' 303 F.2d at 3-4.
 
 
 45
 The plaintiff has shown no change in circumstances which would warrant our ordering now the issuance of the injunction which we refused to order on his prior appeal.
 
 
 46
 The Court has considered all of the contentions of the parties whether or not discussed in this opinion.
 
 
 47
 The order of the Trial Court dismissing the complaint for lack of jurisdiction over Altman, Dembicki, Rowell, Merrick, and Rogers is affirmed. The dismissal as to Calhoon, individually and as representative of all of the members of National Marine Engineers Beneficial Association, for purposes of a class action, is reversed and the cause remanded for a trial on the merits.
 
 
 48
 CAMERON, Circuit Judge, concurs in the result.
 
 
 
 [1]
 The first (Appeal No. 19293) is from an order of the District Court granting motions of defendants Calhoon and Dembicki to quash service, dissolve a temporary restraining order and dismiss the complaint
 The second (Appeal No. 19417) is from several other Orders of the District Court which:
 (a) Granted motion of defendant E. N. Altman to set aside that portion of a previous order allowing substitution of E. N.Altman in place of W. G. Kellogg deceased.
 (b) Granted motion of defendants Buford Rowell, Robert L. Merrick, E. N. Altman and Francis Rogers to quash service, dissolve the temporary restraining order and dismiss the complaint.
 (c) Granted motion of defendant E. N. Altman, individually and as agent of National Marine Engineers Beneficial Association, AFL-CIO, to quash service made on one DeFries as his agent.
 (d) Granted motion of Robert L. Merrick, individually, as Agent of National Marine Engineers Beneficial Association, AFL-CIO, to quash service made on one DeFries as his agent.
 
 
 [2]
 On a prior appeal, we upheld the district court's denial of a temporary injunction as being within 'the sound exercise of judicial discretion.' Calagaz v. DeFries, 5 Cir., 1962, 303 F.2d 588, 590
 
 
 [3]
 Section 199(1), Title 7, Alabama Code,
 
 
 [4]
 Rule 17(b) Federal Rules of Civil Procedure, 28 U.S.C.A. reads:
 '(b) Capacity to Sue or Be Sued. The capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of his domicile. The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized. In all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held, except (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States, and (2) that the capacity of a receiver appointed by a court of the United States to sue or be sued in a court of the United States is governed by Title 28, U.S.C., 754 and 959(a).'
 Rule 23(a)(1), Federal Rules of Civil Procedure, reads:
 '(a) Representation. If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is
 '(1) joint, or common, or secondary in the sense that the owner of a primary right refuses to enforce that right and a member of the class thereby becomes entitled to enforce it.'
 
 
 [5]
 The plaintiff has not, however, shown that the duties of Kellogg, the Executive Vice President, including that of administering the Mobile office, which was the basis for jurisdiction over Kellogg, devolved upon Altman, the President of National MEBA