UNITED STATES ex rel. Christopher Fairbairn ARMSTRONG

v.

H. W. WHEELER, LTC, AGC, Acting Commander, U. S. Army Reserve Components Personnel Center, Fort Benjamin, Harrison, Indiana, Stanley Resor, Secretary of the Army, Melvin Laird, Secretary of Defense.

Civ. A. No. 70-1755.

United States District Court,
E. D. Pennsylvania.

Dec. 2, 1970.

---

A. C. Pearlman, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for plaintiff.

Louis C. Bechtle, U. S. Atty., Merna B. Marshall, Asst. U. S. Atty., Philadelphia, Pa., for defendants.

## OPINION

JOSEPH S. LORD, III, District Judge.

Petitioner seeks a writ of habeas corpus ordering his discharge from the Army as a conscientious objector.

Christopher F. Armstrong, the petitioner, joined the Army's Reserve Officer Training Corps (ROTC) while an undergraduate at Washington and Lee University. He was commissioned a Second Lieutenant in the U. S. Army Reserve in June 1967, upon graduating from college. He was then placed on inactive status and approved for educational delay of his active duty, so that he could attend graduate school. In May 1968, the Army further approved the petitioner for educational delay until June 1969. The Army approved Armstrong's transfer from the Armor to the Military Police branch of the service in April 1969. On June 29, 1969, petitioner notified the Army that he was applying for discharge as a conscientious objector. His formal application was filed August 11, 1969.

Since being commissioned, Armstrong has earned a Master's Degree in Criminology at the University of Pennsylvania and has held several jobs related to this specialty. He worked in Philadelphia, in this judicial district, from February 1969 through the time this petition was filed. He resides in Philadelphia and is a doctoral candidate in sociology at the University of Pennsylvania here.

Armstrong submitted eight supporting letters with his six-page application for discharge as a conscientious objector. In December 1969, he was interviewed by a military chaplain, a military psychiatrist and an Army Lieutenant Colonel, in accordance with Army Regulation (AR) 135-25. On April 2, 1970, a Conscientious Objector Review Board met at Fort Benjamin Harrison, Indiana, and

denied petitioner's application for discharge. He was notified of this decision May 12, the same day he received orders to report on July 5 to Fort Gordon, Georgia, for active duty. Armstrong requested respondent Wheeler, the acting commander of the U. S. Army Reserve Components Personnel Center at Fort Benjamin Harrison to reconsider his application for discharge, but that request was denied. On May 24, petitioner applied to the Army Board for Correction of Military Records seeking "correction" of the Conscientious Objector Review Board decision. No hearing has been held nor decision announced by that Board. Petitioner filed this action June 29.

Consideration of petitioner's claim raises two main issues:

(1) Does this court have jurisdiction to consider this petition?

(2) If this court can hear petitioner's claim, was there any basis in fact for the decision of the Army Conscientious Objector Review Board denying his request for discharge as a conscientious objector?

## I. DOES THE COURT HAVE JURISDICTION?

■ The power to hear habeas corpus petitions is granted to federal district courts by 28 U.S.C. § 2241, which provides in part: "Writs of habeas corpus may be granted by * * * the district courts * * * within their respective jurisdictions." This provision has been construed to require that a petitioner be "in custody" within a district before that district court can hear the case. See, e. g., Ahrens v. Clark, 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948); United States ex rel. Rudick v. Laird, 412 F.2d 16 (C.A.2), cert. denied, 396 U.S. 918, 90 S.Ct. 244, 24 L.Ed.2d 197 (1969).

■ It is settled that retention of a reservist in the Armed Forces is a sufficient restraint on liberty to constitute such "custody." See Hammond v. Lenfest, 398 F.2d 705 (C.A.2, 1968); Donigian v. Laird, 308 F.Supp. 449 (D.C. Md.1969); Koster v. Sharp, 303 F.Supp. 837 (E.D.Pa.1969). Therefore, Armstrong is in custody within the meaning of 28 U.S.C. § 2241(c) (3). Respondent urges, however, that Armstrong is not in custody within this district. That issue is not so settled, but we believe Armstrong is in custody here.

This case is almost identical to Donigian v. Laird, supra, in which Judge Edward Northrop, in a forthright and thoughtful opinion, concluded that the court did have jurisdiction to adjudicate the habeas petition of a reservist who had been commissioned on graduating from college and placed on inactive status in order to pursue graduate study. Donigian had been a student within the district where he brought suit. Like Armstrong, Donigian had received orders to report for active duty [1] before he filed his petition.

The facts here are also very similar to those in Nason v. Secretary of Army, 304 F.Supp. 422 (D.C.Mass.1969). There, the petitioner had been appointed a First Lieutenant in the Army Reserve under the "Berry" Plan for physicians. He was being deferred from active duty pending the completion of his residency training and, like Armstrong, was attached to no particular reserve unit when he sought discharge as a conscientious objector. The court in Nason held that where the petitioner was a reservist following a course of medical training in Massachusetts with the express approval of the Army Reserve Components Personnel Center at Fort Benjamin Harrison, he was in custody in Massachusetts,

---

1. The opinion in Donigian states: "[O]n June 25, 1969, Donigian received orders to report for induction on July 6." Since Donigian was already a commissioned officer at that time, although on inactive status, we assume that the opinion refers to orders to report for active duty on July 6.

and thus the court had jurisdiction to hear his habeas corpus petition.[2]

Respondent's argument that Armstrong is not in custody within this district rests mainly on the line of cases stemming from United States ex rel. Rudick v. Laird, *supra*, which interpret 28 U.S.C. § 2241 to require the petitioner to be both physically present and "detained or held in custody" within a district before that district court can hear his case. *Id.* 412 F.2d at 20; Jarrett v. Resor, 426 F.2d 213, 217 (C.A.9, 1970). In both *Rudick* and *Jarrett*, the courts dismissed the petitions of soldiers on active duty who sought habeas corpus relief in districts where they were on leave between active stations.

■ We need not disagree with the holdings on this point of *Rudick, Jarrett* and the several cases which have dismissed soldiers' habeas petitions for want of jurisdiction on the authority of *Rudick*,[3] for those cases are factually distinguishable. The petitioner here is in a very different situation than were Rudick and Jarrett. Armstrong was not on leave, briefly visiting this district, when he filed this petition: with the ex-

ception of eight months spent working in New York and New Jersey, he has worked, studied and resided in Philadelphia continuously since June 1967. The Army has had substantial contacts with Armstrong here. Only with the express approval of the Reserve Components Personnel Center could he delay his active duty in order to study and work here. The same Center received and ruled on petitioner's intraservice transfer requests. The petitioner was interviewed by Army officers in regard to his conscientious objection in this district. It was here that he received his orders to report to Georgia for active duty.[4] None of these factors alone makes it clear that Armstrong was in custody here. Together, however, they show unequivocally that whatever control the Army has exerted over reservist Armstrong has been exerted over him in this district.[5]

Since the case law clearly treats a reservist retained in the service against his will as "in custody" within the meaning of 28 U.S.C. § 2241(c) (3), *see, e. g.,* Hammond v. Lenfest, *supra,* and since a reservist must be in custody where the

---

2. *But see* Berman v. Resor, 302 F.Supp. 1200 (N.D.Calif.1969), where the court, in ruling on an application for declaratory judgment and an injunction by a reservist in the Army Reserve under the Berry Plan, said that the petitioner would not have been able to maintain a habeas corpus claim in that district. The court did not discuss its reasons for that conclusion.

3. *See, e. g.,* Meek v. Commanding Officer, 320 F.Supp. 1246 (E.D.Pa., 1970); Switkes v. Laird, 316 F.Supp. 358 (S.D. N.Y., 1970); Morales Crespo v. Perrin, 309 F.Supp. 203 (D.C.P.R.1970). *But see* United States ex rel. Lohmeyer v. Laird, 318 F.Supp. 94 (D.C.Md.1970).

4. These orders were stayed by this court pending determination of Armstrong's claim for habeas corpus relief.

5. Judge Northrop's opinion in *Donigian* recognized the vitality of *Rudick* in this area, but also recognized that its application to a case such as that of Donigian (or Armstrong) would be a misapplication:

"In reaching this conclusion, I note that this is a highly unusual situation. This

decision is in no way incompatible with Judge Thomsen's opinion in Weber v. Clifford, 289 F.Supp. 960 (D.Md.1968), in which he observed that a plaintiff in transit from one duty station to another could not properly file an action in this district while on leave. Rather, he stated that 'the proper district in which to file a habeas corpus petition must have been either in Oklahoma, where the orders were issued, or in California, where plaintiff was ordered to report.' *Id.* at 961. *See also* United States ex rel. Rudick v. Laird, 412 F.2d 16 (2d Cir. 1969). In both of those cases the plaintiff was in custody by virtue of his active duty, and had ascertainable duty stations. In both of those cases the custody had no relationship to the jurisdiction in which relief was sought. Here, however, Donigian is not on active duty, and the custody of which he complains relates very definitely to this district. As a general rule the results of *Weber* and *Rudick* are the proper ones; in only the exceptional case would a different resolution be justified." 308 F.Supp. at 453.

Army is exerting control over him, we hold that the petitioner is in custody within this district.

Rather than mandating a different result, the *Rudick* line of cases lends support to this conclusion. Although the court in *Rudick* refused to decide in what district a soldier on leave could seek habas corpus relief, it indicated that it would have no difficulty allowing the action if he were suing while under Army control at either the active duty station from which he was coming (his prior station) or the station to which he was going (his subsequent station). 412 F.2d at 21. Two district court cases which reached the issue in dicta said a soldier on leave could petition for habeas corpus either in the district of his prior active duty station or in that of his subsequent station. Morales Crespo v. Perrin, *supra*, 309 F.Supp. at 205; Weber v. Clifford, 289 F.Supp. 960, 961 (D.C.Md.1968).

The Army's contacts with Armstrong in Philadelphia from 1967 to the present make the city closely analogous to the duty station of a soldier on active duty. He could not have remained here without the approval of the Army. It was here that the Army exerted control over Armstrong. If there is any place in the country akin to the prior active duty station which the *Rudick* line of cases suggests would provide a proper jurisdictional basis for a habeas corpus station, it is Philadelphia.

■ Even though we find Armstrong to be in custody within this district, all jurisdiction problems are not settled. In order to hear a petition for habeas corpus, a court must have personal jurisdiction over a proper custodian of the petitioner. United States ex rel. Rudick v. Laird, *supra*, 412 F.2d at 21; Donigian v. Laird, *supra*, 308 F. Supp. at 452.[6] The respondent here contends generally that the court does not have jurisdiction over the defendants. If proper service of process were made pursuant to the Federal Rules of Civil

Procedure or some other federal statute and if the respondents had sufficient contacts with this district to satisfy due process, then this court has personal jurisdiction over them.

Petitioner contends that we have jurisdiction over respondents by virtue of 28 U.S.C. § 1391(e) which provides in part:

"A civil action in which each defendant is an officer or employee of the United States or any agency thereof acting in his official capacity * * * may * * * be brought in any judicial district in which * * * the plaintiff resides * * *

"The summons and complaint in such an action shall be served as provided by the Federal Rules of Civil Procedure except that the delivery of the summons and complaint to the officer or agency as required by the rules may be made by certified mail beyond the territorial limits of the district in which the action is brought."

Petitioner served the United States Attorney in this district with copies of the motions in this case personally and served the other three respondents and the Attorney General of the United States with similar copies by registered mail, return receipt requested.

There appears to be some disagreement as to whether § 1391(e), which is titled a "venue" statute, operates to expand the personal jurisdiction of the district court over employees and officers of the United States. The court in *Rudick* regarded § 1391(e) as solely a venue statute, and thus found that the respondents who were outside the district could not properly be served. 412 F.2d at 20, 21. The Second Circuit there apparently overlooked the service of process provisions of the subsection. It remedied this oversight in the recent case of Liberation News Service v. Eastland, 426 F.2d 1379 (C.A.2, 1970), a suit seeking a preliminary injunction against

---

6. 28 U.S.C. § 2243 expressly requires that the writ of habeas corpus, if issued, must be directed to the person having custody of the petitioner.

the members and general counsel of a Senate subcommittee. There the court said of § 1391(e): "If the section were applicable, it would indeed supply both venue, since plaintiffs reside within the district, and jurisdiction over the persons of the Senators and their counsel." *Id.* at 1382.[7] It termed the purpose of the statute to be a broadening of the provisions on venue and service of process "so that when a superior officer residing in Washington was a necessary party the action could still be brought in the field, with personal jurisdiction over the superior obtainable by service of process by mail, * * * " *Id.* at 1384. *See also*, to the same effect, United States ex rel. Lohmeyer v. Laird, 318 F.Supp. 94 (D.C.Md.1970); Metz v. United States, 304 F.Supp. 207, 209 (W.D.Pa.1969); 2 J.Moore, Federal Practice, ¶ 4.29, at 1210–11, 1214–15 (2d ed. 1967); 4 Wright & Miller, Federal Practice and Procedure: Civil § 1107 at 416–21.

■ Switkes v. Laird, 316 F.Supp. 358 (S.D.N.Y.1970), decided after the Second Circuit opinion in Liberation News Service v. Eastland, *supra*, tried to reconcile that case with *Rudick* on the grounds that a habeas corpus action is not a "civil action" within the meaning of § 1391(e), and thus that section would apply to actions for injunctions, but not to habeas corpus actions. The court in *Switkes* based its conclusion on the Supreme Court's characterization of a "civil" label for habeas corpus as "gross and inexact." Switkes v. Laird, *supra*, citing Harris v. Nelson, 394 U.S. 286, 293–294, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969). In so concluding, however, the court apparently overlooked the Supreme Court's statement in the previous sentence: "It is, of course, true that habeas corpus proceedings are characterized as 'civil.'" Harris v. Nelson, *supra*, at 293, 89 S.Ct. at 1087.[8] Since habeas corpus is generally termed a "civil" action and since it was the apparent intent of Congress to "facilitate review by the Federal courts of administrative actions"[9] (precisely the situation presented here), the phrase "civil actions" in § 1391(e) should be read to include habeas corpus actions.

■ Having found a statutory grant of personal jurisdiction, we must still establish that one or all of the respondents is a proper custodian of Armstrong and has sufficient contacts with this district to satisfy due process. In Donigian v. Laird, *supra*, the court held that it did not have jurisdiction over Secretaries Laird or Resor, although its ground for so holding were unclear. 308

---

7. Section 1391(e) was found not applicable in *Liberation News Service* on the ground that members of the Senate were not "officers" within its meaning. The Second Circuit ruled that Congress had intended section 1391(e) to apply only to the executive branch. 426 F.2d at 1384. The respondents here are all part of the executive branch.

8. We have neither found in our research nor have been referred to any cases other than *Switkes* which even discuss the relation between "civil action" as it is used in section 1391 and habeas corpus. The *Harris* case dealt with the interpretation of Federal Rule of Civil Procedure 81(a) (2) as it related to the application of Rule 33 discovery in habeas corpus proceedings.

It would appear that Congress seemed to be most concerned with mandamus proceedings when it passed Sections 1361

and 1391 together in 1962, cf. S.Rep.No. 1992, 87th Cong. 2d Sess. (1962). However, this concern was motivated by the more encompassing purpose to remove procedural obstacles to suits against centralized governmental officials. *Id.* Since the custodian in habeas corpus actions is almost always within the same district as the petitioner, it is logical that the Congress would not directly consider such actions when addressing itself to the problem of such procedural obstacles. To rule that habeas corpus did not come within the scope of this statute would solidify procedural obstacles to suits against central administrators, which obstacles Congress had clearly indicated were undesirable.

9. S.Rep.No.1992, 87th Cong., 2d Sess., reprinted in 2 U.S.Code Cong. & Adm.News, pp. 2784, 2785 (1962).

F.Supp. at 452.[10] It did rule that the Commander of the Army Reserve Components Personnel Center was the only real custodian of the petitioner. Since all Army dealings with Armstrong appear to have been directed by that Center, we hold that its commander, respondent Wheeler, is a proper custodian. Having found a proper custodian, who has been properly served under 28 U.S.C. § 1391(e), we need not decide whether Secretaries Laird and/or Resor are proper custodians, an issue which has inspired differing opinions. Compare, *e. g.*, Donigian v. Laird, *supra, with* Silberberg v. Willis, 306 F.Supp. 1013 (D.C.Mass. 1969).

Colonel Wheeler is constitutionally subject to this court's jurisdiction if he has sufficient contacts with this district such that the maintenance of the suit does not offend traditional notions of fair play. *Cf.* Calagaz v. Calhoon, 309 F.2d 248 (C.A.5, 1962). By virtue of his contacts with petitioner, Colonel Wheeler has satisfied this test.[11] We therefore hold that we have personal jurisdiction over respondent Wheeler, as well as subject matter jurisdiction over the petitioner's custody within this district and that we have jurisdiction to hear petitioner's complaint.

There are strong policy reasons favoring this holding. If petitioner were not allowed to maintain his habeas corpus action in this district, he and others similarly situated throughout the country would have to seek discharge by habeas corpus in the district of Colonel Wheeler's official residence. The control of

inactive reservists such as Armstrong has been centralized for the convenience of the Army. It would hardly comport with the increasingly broad scope of habeas corpus, *see* Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963), to hold that the Army, merely by assigning a soldier to a central, rather than local, command, can dissipate his right to habeas relief where he is under its control. Since records are readily transferable, since no witnesses are necessary where, as here, the determination is to be made from the record, and since the Army has legal representatives in every judicial district in the persons of United States Attorneys, there seems little practical reason to require all habeas actions to be brought in the one district where the Army central command is located.

## II. DID THE DECISION OF THE ARMY CONSCIENTIOUS OBJECTOR REVIEW BOARD HAVE ANY BASIS IN FACT?

The scope of judicial review of military orders is very limited: we must let stand the Army Conscientious Objector Review Board's denial of Armstrong's application for discharge unless that denial had no basis in fact. United States ex rel. Brooks v. Clifford, 409 F.2d 700, rehearing denied 412 F.2d 1137 (C.A.4, 1969); Bates v. Commander, First Coast Guard District, 413 F.2d 475 (C.A.1, 1969); Hammond v. Lenfest, *supra*; Koster v. Sharp, 303 F.Supp. 837 (E.D.Pa.1969). The standard by which petitioner's in-service claim was to be judged was, according to Department of

---

10. The court in *Donigian* said it did not have personal jurisdiction over Secretaries Laird and Resor because they could only be sued in Washington. Yet, it noted that the Commander of the Army Reserve Component Personnel Center had been properly served under Section 1391(e) and went on to hold it did have personal jurisdiction over him. Apparently he was served by registered mail just as the Secretaries were. If the court was attempting to distinguish between the Commander and the Secretaries on the basis of some inherent characteristic of their

offices, it did not say so. The only distinction drawn was that the Commander was the only real custodian.

11. Although the record was bare as to the other contacts which Colonel Wheeler has with this district in his role as Commander of the Center, it seems obvious that there are other reservists here directly or indirectly under his control and that he takes advantage of the laws and facilities of this state in maintaining the desired quantity and quality of reservists.

Defense regulations,[12] the same as that for judging the conscientious objection of Selective Service System registrants under the Selective Service Act, 50 U.S.C.A. § 456(j):

> "Nothing contained in this title * * * shall be construed to require any person to be subject to combatant training and service who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. As used in this subsection, the term 'religious training and belief' does not include essentially political, sociological, or philosophical views, or a merely personal moral code. * * * *"

AR 135–25, under which petitioner's application was processed echoes the requirement of conscientious objection to war in any form by reason of religious training and belief. Given this standard, we must look to the record to determine whether the Board had a basis for finding either (a) that Armstrong was not sincere in his objection to war, or (b) that Armstrong's claim was not based on religious training and belief.

## A. *Sincerity*

The Conscientious Objector Review Board reached its decision solely on the basis of the record before it, consisting of the petitioner's application, letters supporting that application, his personnel records, and reports from the three officers who interviewed Armstrong and from the Chief of the Delayed Officer Management Division. All eight letters and all four reports attest to the sincerity of the petitioner's beliefs. The military chaplain who interviewed Armstrong said, "I have no doubts as to his sincerity in his statement that he is a conscientious objector at this point of time." The military psychiatrist who interviewed him reported that "his sincerity and the strength of his convictions were remarkable." In spite of these reports, the Board unanimously concluded that Armstrong's beliefs were not truly held and pronounced that he "has not presented an iota of information to prove that his claim as a conscientious objector is anything, but at worst, a fabrication; at best, a claim based on reasons other than those set down in the governing statute."

The Board did not make it clear what it was relying on in reaching its conclusion that Armstrong was insincere, if it was indeed so concluding.[13] It seems to rely heavily on the fact that Armstrong first joined ROTC in 1965, but did not mention his conscientious objector beliefs until June 1969, two weeks after he had requested a branch transfer without mentioning any moral qualms. It also

12. DOD 1300.6, IV(B) (3) (b) states: "Since it is in the national interest to judge all claims of conscientious objection by the same standards, whether made before or after entering military service, Selective Service System standards used in determining I–O or I–A–O classification of draft registrants prior to induction shall apply to servicemen who claim conscientious objection after entering military service."

13. We have the same difficulty deciphering the Board's memorandum as did Chief Judge John W. Lord, Jr. of this district when faced with what seems to be a stock paragraph. In one breath the Board explictly found Armstrong's beliefs were not truly held; in the same sentence, they hedge by admitting he may truly hold some beliefs. They said:

"The Board unanimously believed that [Lt. Armstrong's] alleged conscientious objector beliefs are not truly held; are not grounded in religious training and belief; and any objection to war in any form he might truly hold is based solely on [sociological experiences, philosophical views and a personal moral code]."

In Weber v. Commanding Officer, 317 F.Supp. 651 (E.D.Pa.1970), Chief Judge Lord expressed confusion when faced by remarkably similar Board language, which was used to deny another soldier's conscientious objector discharge. The Board there said:

"The Board unanimously believed that Pvt. Weber's alleged conscientious objector beliefs are not truly held' * * * and any objection to war he might truly hold is based solely on a personal moral code and philosophical reasons."

seems to feel that Armstrong's sincerity is impeached because his claim obviously does not arise from religious training and belief.

▇▇▇▇▇ The Board's disbelief in an applicant's sincerity will not justify rejection of his claim for discharge as a conscientious objector unless there is some affirmative evidence of insincerity or "there is something in the record which *substantially* blurs the picture painted by the registrant and thus casts doubt on his sincerity." Kessler v. United States, 406 F.2d 151, 156 (C.A.5, 1969); United States v. James, 417 F.2d 826, 832 (C.A.4, 1969). Doubt as to sincerity cannot rest on speculation. Bates v. Commander, First Coast Guard District, *supra*; Dickinson v. United States, 346 U.S. 389, 397, 74 S.Ct. 152, 98 L.Ed. 132 (1953). Even though everyone who has had personal contact with Armstrong has testified that he is sincere, there *might* be a basis in fact for a Board finding of insincerity if certain statements or facts in the record pointed inescapably to such a conclusion.[14] The late maturation of Armstrong's claim is in no way inconsistent with sincerity of belief. *See, e.g.*, Silberberg v. Willis, *supra*, 306 F. Supp. at 1021–1022. There are no other facts or statements in the record that would give any basis in fact to the Board's finding of insincerity.

#### B. *Religious Training and Belief*

The findings of the Conscientious Objector Review Board notwithstanding, the record establishes that petitioner's objection to war in all forms stems from religious training and belief as that concept has been expanded by United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), and Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970). The Court in *Welsh* clarified the standard which determines whether a claimant's objection is the result of religious training and belief:

"What is necessary under *Seeger* for a registrant's conscientious objection to all war to be 'religious' within the meaning of § 6(j) is that this opposition to war stem from the registrant's moral, ethical, or religious beliefs about what is right and wrong and that these beliefs be held with the strength of traditional religious convictions." 398 U.S. at 339–340, 90 S.Ct. at 1796.

It is this standard against which the facts concerning a particular applicant for conscientious objector status must be measured. Only if the Board found facts which would support rejection of Armstrong's claim as "non-religious" under this standard can we find that there was a basis in fact for its decision.

▇▇▇▇▇ Assessing the facts found by the Board in this regard is complicated by its consistent misinterpretation of the applicable standard. We have examined the stated bases for its decision that Armstrong's conscientious objector beliefs are not grounded in religious training and belief, and we find there was no basis in fact for that conclusion.

The Board first mentioned that Armstrong's application stated he was influenced by the "philosopher", Henry David Thoreau. It also found that he was "most strongly influenced by his father's love and pure and simple sociological experiences." Petitioner's application for discharge, however, was replete with references to his and his family's strong church attachments during his childhood. He recounted several experiences in later years either directly related to organized religion or of a spiritual nature.[15] Armstrong related in his

---

14. *But cf.* Talford v. Seaman, 306 F.Supp. 941 (D.C.Md.1969), and Reitemeyer v. McCrea, 302 F.Supp. 1210 (D.C.Md. 1969), which suggest that if those who have had personal contact with the applicant find him sincere, there may be automatically no basis in fact for a contrary Board finding.

15. Armstrong characterized as "one of the most meaningful experiences of my life" a feeling which he experienced while in high school. Returning from a cross-country run one day, he lay down in a field and felt himself overcome by a mystical sensation drawing him into a oneness with his surroundings: "I felt the clouds

application that his post-college experiences as a social worker and criminologist had further shaped his beliefs and solidified his religious faith. He summarized his opposition to war:

> "War denies one's humanity—it annihilates the potential to love in man. It denies the humanity of the enemy in its total effort to destroy him. As I have chosen to devote my life trying to reaffirm the love element in man as a reflection of my faith in God, I cannot bear arms, nor even consent to be a part of an organization that condones war and the destruction of man."

The Supreme Court in *Seeger* noted that not all views which fall within the statutory meaning of "religious" are orthodox. The Court said:

> " * * * Some believe in a purely personal God, some in a supernatural deity; others think of religion as a way of life envisioning as its ultimate goal the day when all men can live together in perfect understanding and peace. * * *" 380 U.S. at 174, 85 S.Ct. at 858.

The statements by the petitioner, supported by letters from those who know him, and uncontroverted by any other evidence or Board findings show that under the standards set down in *Welsh* and *Seeger* his beliefs are at least in part "religious." Where one's objections to war are based even in part on moral, religious or ethical principles he is entitled to conscientious objector status. Welsh

v. United States, *supra,* 398 U.S. at 342–343, 90 S.Ct. 1792, 26 L.Ed.2d 308.

In its other findings, the Board held that the petitioner's discussion of the use of force was not believable because he quoted several lines from Tennyson out of context,[16] and it found his claim of a religious basis to his beliefs further discredited by the fact that the Episcopal Church does not "teach" conscientious objections. The Supreme Court has specifically protected conscientious objector applicants from any form of credo tunnel vision on the part of those who judge his application:

> "The validity of what he believes cannot be questioned. * * * Local boards and courts in this sense are not free to reject beliefs because they consider them 'incomprehensible.' * * *." United States v. Seeger, *supra,* 380 U.S. at 184, 85 S.Ct. at 863.

Similarly, it is clearly established in law, if not in the minds of the Review Board officials who are supposed to apply it, that for an applicant's belief to be "religious", he need not be affiliated with a religious sect, nor need any religious sect with which he is affiliated require conscientious objection as a tenet of the faith. Bates v. Commander, First Coast Guard District, *supra,* 413 F.2d at 479–480.

The final objection stated by the Board to discharging Armstrong as a conscientious objector was that his religious experiences occurred before he entered military service. Under DOD

---

blur into the sea of sky and seemed to become part of an omnibus presence. The sounds diminished. I felt far away,

16. In discussing force in his application, Armstrong spoke of war and said it was tragic that "often the plight of the combatants might be suitably summarized by a well-known line of poetry, 'Theirs not to reason why/Theirs but to do or die.'" drawn into my surroundings. I shall not forget this experience as long as I live."

Because this line comes from Tennyson's poem immortalizing the Charge of the Light Brigade, which, in the minds of the Army officials, glorified war, the Board members evidently felt Armstrong either was being dishonest in just quoting part of the poem or that a quote from that poem meant that he adopted the whole poem *and* their interpretation of it and thus discredited his opposition to war. In any event, the Board's position is ludicrous.

Directive 1300.6, IV(B) (2), conscientious objection will not be considered as grounds for discharge unless it arose after enlistment. The statements of the petitioner showed that his experiences at ROTC training camp and after graduation from college strongly influenced his perception of war and the Army, so that he came around to the position of conscientious objection. That this growth was natural and in no way suggests that he was a conscientious objector before his enlistment in 1965 was brought directly to the Board's attention by the letter from The Rt. Rev. Paul Moore, Bishop of the Diocese of Washington, in which the Bishop said:

"His [Armstrong's] faith has developed over the years and from being an enthusiastic participant in the ROTC because of his sense of patriotism he has now, I believe, come around to a position which rejects violence. This often happens as a person's faith matures and I believe that this gradual change in Kip's position has developed through his own religious life."

The Board therefore had no basis for finding that the petitioner's conscientious objection had arisen before his enlistment.

In sum, we find that the Conscientious Objector Review Board had no basis in fact for finding that Armstrong did not meet the standards for conscientious objection set by law. His conscientious objector beliefs were truly held and were founded on religious training and belief.

ORDER

And now, this 2nd day of December 1970, it is ordered that the petition of Christopher Fairbairn Armstrong for a writ of habeas corpus is hereby granted. Execution of the writ shall be stayed for a period of ten (10) days to afford an opportunity for appeal, but no further stay will be granted by this court.