**Milton FAROWITZ, Plaintiff,**

v.

**ASSOCIATED MUSICIANS OF GREAT-
ER NEW YORK, LOCAL 802,
A.F. of M., Defendant.**

United States District Court
S. D. New York.

May 11, 1965.

Godfrey P. Schmidt, New York City, for plaintiff.

Ashe & Rifkin, New York City, for defendant, David I. Ashe, New York City, of counsel.

LEVET, District Judge.

The plaintiff, Milton Farowitz (hereinafter "Farowitz"), alleging jurisdiction by reason of Title I of the Labor-Management Reporting and Disclosure Act of 1959 (hereinafter "LMRDA"), 73 Stat. 522, 29 U.S.C. §§ 401–415, seeks a permanent injunction (a) requiring defendant, Associated Musicians of Greater New York, Local 802 (hereinafter "Local 802"), to cancel and void the "unlawful expulsion of Farowitz"; (b) requiring defendant to reinstate plaintiff to full membership in the defendant union; and (c) a judgment awarding to plaintiff money damages resulting from defendant's alleged unlawful expulsion.

The expressed basis of the expulsion by Local 802 was the plaintiff's publication of a bulletin which defendant claims advised its members not to pay certain so-called union 1½% Local taxes and thus, in the words of the union, struck "at the life blood" of the union. The plaintiff, however, contends that he has been deprived of freedom of speech (the right to express any "views, arguments and opinions") which is guaranteed in the "Bill of Rights," subchapter of LMRDA, 29 U.S.C. § 411(a) (2).

The pertinent statutory provisions, 29 U.S.C. § 411(a) (2), (4), read as follows:

"(2) Freedom of speech and assembly.—Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

\* \* \* \* \* \*

"(4) Protection of the right to sue.—No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: *Provided,* That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof: *And provided further,* That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition."

Certain relevant definitions are set forth in 29 U.S.C. § 402:

"(e) 'Employer' means any employer or any group or association of employers engaged in an industry affecting commerce (1) which is, with respect to employees engaged in an industry affecting commerce, an employer within the meaning of any law of the United States relating to the employment of any employees or (2) which may deal with any labor organization concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work, and includes any person acting directly or indirectly as an employer or as an agent of an employer in relation to an employee but does not include the United States or any corporation wholly owned by the Government of the United States or any State or political subdivision thereof.

\* \* \* \* \*

"(o) 'Member' or 'member in good standing', when used in reference to a labor organization, includes any person who has fulfilled the requirements for membership in such organization, and who neither has voluntarily withdrawn from membership nor has been expelled or suspended from membership after appropriate proceedings consistent with lawful provisions of the constitution and bylaws of such organization."

Local 802 defends on three grounds:

(1) Plaintiff's right of free speech is limited by the right of Local 802 "to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations." 29 U.S.C. § 411(a) (2). In short, Local 802 pleads fiscal self-preservation.

(2) Plaintiff did not exhaust his intra-union remedies as required by the first proviso of 29 U.S.C. § 411(a) (4), above stated.

(3) A certain employer or certain employers financed, encouraged or participated in this action contrary to the prohibition in the second proviso of 29 U.S.C. § 411(a) (4).

Prior proceedings in this case included an application by plaintiff for a preliminary injunction in May, 1963, which resulted in an Opinion, Findings of Fact and Conclusions of Law, dated May 28, 1963, and an order granting the preliminary injunction, dated June 7, 1963. After an appeal by defendant, the order was affirmed by the Second Circuit on April 29, 1964, 330 F.2d 999.

It was conceded that Joseph Carroll and Ben Cutler were employers in the single engagement field (184–185) and that Peterson's corporation (Charles Peterson Theatrical Productions, Inc.) was an employer in the single engagement

field. (185, 186) It was stipulated that the court might take judicial notice of other actions involving the parties in this court. (364, 365)

The case was tried to the court without a jury. After hearing the testimony of the parties, examining the exhibits, the pleadings, the stipulations of counsel, the briefs and proposed findings of fact and conclusions of law, this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

### PRELIMINARY

1. Plaintiff is a sideman [1] in the single and steady engagement field and prior to November 14, 1962 was and for years had been a member in good standing of defendant Local 802. Plaintiff, now a life insurance underwriter, was a full-time musician until November 14, 1962, playing the trumpet.

2. Defendant Local 802 is a labor organization within the meaning of the LMRDA of 1959, 29 U.S.C. § 402(i). It is affiliated with the American Federation of Musicians of the United States and Canada (hereinafter called "Federation" or "AFM"). Membership in Local 802 results in membership in the Federation.

3. Local 802 and Federation and their members are involved in an industry which in the single (and the steady) engagement field is an industry affecting interstate commerce. See Cutler v. American Federation of Musicians, supra, 211 F.Supp. at 435; Carroll v. American Federation of Musicians, 295 F.2d 484, 486 (2nd Cir. 1961).

4. A single engagement is defined in the By-Laws of defendant Local 802 (Ex. 26, Art. X, p. 63) and is a musical performance generally for one night but always for less than one week, including, but not limited to, such types of functions as weddings, commencements, debutante parties, fashion shows, sports events, college or high school dances or other social events. See also Carroll v. Associated Musicians of Greater New York, 206 F. Supp. 462, 465 (S.D.N.Y.1962), aff'd, 316 F.2d 574 (2nd Cir. 1963). In the steady engagement field the musicians are engaged on a longer term basis by hotels, restaurants, night clubs, theatres, symphony associations, etc.

5. The By-Laws of Local 802 in force at the time relevant in this action provide:

> "There shall be payable by and collected from all members a 1½% tax on all engagements based on scale price, therefore: Leaders shall be held responsible for the collection and payment of this Tax." (Pl. Ex. 28, at p. 66)

In a subsequent court action, Schwartz v. Associated Musicians of Greater New York, Local 802 (S.D.N.Y.), it was decided by this court on October 29, 1963, 237 F.Supp. 149, and affirmed by the Court of Appeals, 340 F.2d 228 (2d Cir. 1964), that the tax constituted membership dues and that it was the obligation of every member to pay it.

## EVENTS LEADING TO EXPULSION

6. This court in Carroll v. Associated Musicians of Greater New York, 206 F. Supp. 462 (S.D.N.Y.1962), aff'd, 316 F.2d 574 (2d Cir. 1963), determined on June 25, 1962 that the compulsory collection of the 1½% Local tax and the 10% traveling surcharge by employer-leaders in the single engagement field violated Section 302 of the LMRA, 29 U.S.C. § 186.

7. A similar conclusion was reached in Cutler v. American Federation of Musicians, supra. The Cutler action was instituted on July 20, 1962 and the decision rendered on November 2, 1962, before the plaintiff herein was notified of his ouster. Judgment was entered on

---

1. A "sideman" is a musician who performs in a band or orchestra but who is not the leader or conductor of said band or orchestra. Cutler v. American Federation of Musicians, 211 F.Supp. 433, 436 at note 2 (S.D.N.Y.1962), aff'd, 316 F.2d 546 (2nd Cir. 1963), cert. denied, 375 U.S. 941, 84 S.Ct. 346, 11 L.Ed.2d 272 (1963).

November 14, 1962 and affirmed April 30, 1963.

8. In August, 1962 (433), after the decision in Carroll v. Associated Musicians of Greater New York, a statement entitled, "Official Statement By the Executive Board," [2] concerning the tax, was issued. It proclaimed that the court decision was applicable to the exaction of the Local tax from leaders only. The individual members were still obligated to pay the tax. (Ex. H)

9. Both before and after the issuance and publication of the Local's Official Statement" (Ex. H), at times after June 25, 1962 and prior to his expulsion on November 14, 1962, the plaintiff distributed a handbill entitled, "THEY ARE UNLAWFUL" on the Exchange Floor [3] of the Local. The handbill read as follows:

"*   *   * THEY ARE UNLAWFUL *  *  *"

"1. THIS IS THE STATEMENT OF THE DECISION RENDERED BY FEDERAL JUDGE LEVET CONCERNING THE 10% TAX AND THE 1½% LOCAL 802 TAX. AFTER LISTENING TO THE EVIDENCE FOR ONE SOLID WEEK, THE JUDGE MADE THE STATEMENT THAT YOU SEE ABOVE. DON'T TAKE OUR WORD FOR IT LISTEN TO WHAT THE JUDGE .WHO HEARD THE CASE RULED. THE STATEMENT ABOVE IS AN EXACT QUOTE FROM THE COURT RECORD. THESE TAXES 'ARE UNLAWFUL', *WHY PAY IT?*

"2. FEDERAL JUDGE LEVET RULED THAT THE LEADERS CANNOT ACCEPT NOR DEMAND FROM YOU THE 10% TAX AND THE 1½% TAX AND GIVE IT TO THE UNION.

"3. THE BY-LAWS OF THE LOCAL AND THE FEDERATION SAY THAT 'THE LEADER SHALL BE RESPONSIBLE FOR THE PAYMENT OF THE SIDEMAN'S TAXES'. THIS HAS BEEN RULED *'UNLAWFUL'* BY THE COURT. THEREFORE, THERE IS *NOTHING* IN THE UNION RULES THAT SAY 'YOU THE SIDEMAN MUST PAY IT TO THE UNION'.

"4. *NOW MOST IMPORTANT OF ALL IS THIS INFORMA-*

2. This statement included in part the following words:

"*LOCAL 802-AFM TAXES*

"*The obligation to pay the 1½% tax is imposed by our By-Laws upon each and every member of the Local.* Do not be misled by the false statements and advice now being disseminated that only leaders collect and pay the tax to the Union. A pamphlet has been issued by 'The Positive Action Ticket' to that effect. But that same pamphlet has conveniently overlooked the following language in the same Standing Resolution (at page 66 of the Constitution and By-Laws booklet) from which their leaflet quotes:

" '*There shall be payable by and collected from all members* a 1½% tax on all engagements based on scale price.'

"Language couldn't be clearer than this. The tax is 'payable by  *   *   * all members' and it is to be 'collected from all members.'

"The obligation of the leaders is only a means designated to help the Union *collect* the tax from all members. Since this provision was inserted only for the benefit of the Union, the Union can waive it and insist that the members themselves, who are *primarily responsible* for the payment of the tax, should pay it directly." (Ex. H)

3. Local 802 provides an "Exchange Floor" to aid members in securing single engagements. Leaders use the facilities of the Floor to select sidemen. See Carroll v. Associated Musicians of Greater New York, 206 F.Supp. at 465.

*TION:* CHARGES HAVE BEEN FILED WITH THE NATIONAL LABOR RELATIONS BOARD AGAINST LOCAL 802, THE AMERICAN FEDERATION OF MUSICIANS AND *LEADERS* CONCERNING THESE TAXES. THE CHARGE IS THAT THE LEADERS HAVE BEEN ILLEGALLY FORCING YOU TO GIVE THEM THIS TAX MONEY SO THAT THE LEADERS CAN PASS IT OVER TO THE UNION.

"5. THE FEDERATION OR ITS LOCALS CANNOT FORCE A LEADER TO COLLECT TAXES FROM THE SIDEMAN.

"6. IF THERE ARE ANY THREATS BY THE UNION OR THE LEADER REGARDING THESE TAXES, NOTIFY ME BY MAIL AND WE WILL *GO TO COURT IMMEDIATELY.*"

> "MILT FARROW
> 14–25 Sunnyside Street
> Far Rockaway 91
> Queens, N.Y."
> (Ex. 1)

### THE CHARGES, THE TRIAL, AND THE EXPULSION

10. On September 10, 1962, plaintiff was charged by Local 802 through its sergeant-at-arms, one Benjamin J. Schwartz, of violations of Article IV, Section 1, paragraphs (k), (jj) and (i), in that "defendant publicly issued a leaflet to members of Local 802 A.F. of M. advising them and urging them not to pay the 1½ per cent tax required to be paid by the working members in accordance with the bylaws of Local 802 A.F. of M." (Ex. 2)

11. Article IV, Section 1, paragraphs (k), (jj) and (i) of the defendant's By-Laws provide:

"(k) To violate or fail to comply with, or to cause or induce or advise anyone else to violate or fail to comply with the constitution or bylaws of the price lists contained in Article 10 as the same now exist, or as they may be hereafter enacted, changed, or amended; * * *

"(jj) To commit any act of bad faith or unfair dealing which has for its purpose the injuring of the local or any of its officers or members, or the American Federation of Musicians, its locals or the officers and members thereof, respecting the affairs and welfare of the local or of the American Federation of Musicians or any of its affiliated locals, or respecting in general the welfare of the musical profession; * * *

"(i) To fail to comply with the instructions or orders of the executive board or any other proper authority of the local; * * *" (Ex. 28)

12. Prior to the time of the charges made against Farowitz, no officer of Local 802 spoke to him about the circulation of the handbill (i. e., Ex. 1). (26)

13. A hearing on the aforesaid charges was originally scheduled for October 9, 1962 (see p. 16a of Appendix to Appellant's Brief in appeal from the preliminary injunction order) but was postponed to October 30, 1962 (see pp. 17a–21a of said Appendix), at which time Farowitz appeared before the Trial Board of Local 802 and testified, raising the defense of freedom of speech.

14. At the trial of the charges on October 30, 1962, an off-the-record offer was made to Farowitz by Earl Shendell, Chairman, and other Trial Board members to the effect that "You [i. e., Farowitz] don't have to be expelled if you are willing to print a retraction of this pamphlet." (28–30) Farowitz said that one member directed that his defense remarks be stricken (30) and during the trial the Chairman and other members ordered parts of the questions and answers deleted. (34) Another member of the Board "Yelled" that the real charge was that Farowitz was a Peterson man. (31, 32)

15. There was no proof presented at the hearing at the Local 802 Trial Board nor before this court that plaintiff by the circulation of the leaflet (Ex. 1) had at any time interfered with the union's performance of "its legal or contractual obligations." (Ex. 2) Similarly, there was no proof that publication and distribution of plaintiff's leaflet had injured defendant or had induced other members of Local 802 to withhold dues. (Ex. 2) The proof before the court now is still insufficient to establish that the leaflet caused members to withhold dues. (295–297, 397–399, 403–404, 412–417)

16. On November 14, 1962, the Trial Board rendered its decision in a letter to plaintiff finding him guilty as charged. The basis of the decision was that the plaintiff continued to distribute his pamphlet after the Executive Board of Local 802 had expressed its interpretation of certain court decisions holding the taxes illegal. The decision stated:

"Nevertheless, with full knowledge of these facts, the defendants deliberately urged all members of Local 802, to refuse to pay the 1½% tax. This tax is part of the membership dues of the Local and is a principal source of the Local's income. Without this income the Local could not continue to exist and carry on its work on behalf of its membership. The defendant was, therefore, seeking to undermine the very existence of the Local. By doing so, he clearly violated the above sections of the By-Laws, and we find him guilty as charged. In view of the fact that if the defendant had been successful in his efforts the Local could have been destroyed or rendered impotent to carry out its proper functions, it is our decision that he be expelled from membership." (Ex. 4)

17. On or about November 14, 1962, Farowitz received notice of his expulsion (Ex. 4) by certified mail. (34, 35) Plaintiff's name appeared in "Allegro," (275) the official publication of Local 802, in the December 1962 issue (Ex. 3)

on page 23 in an alphabetical list of expelled persons. (278) It also appeared, by order of the Executive Board of Local 802, on page 28 in a box. (37) The box notice in large type stated:

"EXPULSION

MILTON FARROW [FAROWITZ] has been expelled from membership in Local 802.

Please be advised that any member working with him will be subject to charges." (Ex. 3)

These notices continued to be published monthly. (35–41, 282, 284, 337, 449, 451)

After the preliminary injunction of June 7, 1963 (Appendix 122a–123a), the union published a notice in "Allegro" which read as follows:

"Pursuant to a temporary injunction issued by Federal Judge Levet, Local 802 withdraws any objections to Milton Farowitz's working with Union musicians, even though he is not a member."

However, the defendant still continued to publish plaintiff's name as an expelled member in the regular alphabetical list until January, 1965. (38, 98, 282, 283, 285, 449, 450, 451)

### EXHAUSTION OF INTRA-UNION REMEDIES
### 29 U.S.C. § 411(a) (4)

18. The plaintiff took no appeal from the November 14, 1962 decision of the Local's Trial Board, although Article 8, Section 1 of the Federation's By-Laws grants a right of appeal to the Federation's International Executive Board. (Ex. 29) Nor did plaintiff request the AFM President to stay the judgment of the Trial Board or to extend plaintiff's time for filing an appeal, although Article 8, Sections 2 and 4 of the AFM By-Laws permit such requests. (Ex. 29, pp. 52, 197)

19. (a) On December 4, 1962, Farowitz wrote to the Board for the trial minutes. (Ex. 20) Apparently, the minutes were sent on or about December 7, 1962. (Ex. E)

(b) On March 15, 1963, Farowitz wrote to the Board or its Secretary claiming that the minutes were belatedly given and asking for a new trial or rehearing. (Ex. 22) An application for a rehearing is permitted within ten days after the notification of the Trial Board's decision. (By-Laws of Local 802, Art. V, Sec. 2, p. 45, Ex. 26)

(c) Earl Shendell, Chairman of the Trial Board which heard the charges against Farowitz, instructed a clerk to mail plaintiff a copy of the Trial Board minutes. (434–437) A copy of the letter of transmittal, dated March 22, 1963 (Ex. 21), was retained in the files of Local 802. (440) Shendell's secretary signed the letter. (445)

(d) In another letter dated March 22, 1963, Mr. Shendell wrote: "Since you do not in any way specify why you claim that the trial you had was unfair or what 'inequities' you were subjected to, the Trial Board can find no basis for granting you a rehearing or a new trial." (Ex. 5)

20. Max L. Arons, Secretary for the last six years and member of the Executive Board of Local 802 (251), stated that the union treated expulsions in exceptional ways "when a man [e. g., Farowitz] is out to ruin the union, and then it is the duty of the union to protect itself." (265) Farowitz, he said, "did everything, propagandized leaflets, to cut off the life blood of the union." "The only way a union can exist is upon the payment of dues." (266) "He issued the leaflets calling upon all members not to pay their taxes." (268, 269) Arons conceded that at the time Farowitz was notified of his expulsion on November 14, Farowitz was not notified that his was an "exceptional" case. (274) Arons said there were three exceptional cases in the last three or four years, apparently referring to Peterson, Carroll and Johnny Davis. (275–277)

21. Until the case of Farowitz and Peterson, names of expelled members were published in a small column; afterwards they were published in a large box. (337)

22. Manuti, President of Local 802 prior to plaintiff's expulsion and a member of the International Executive Board (420), at Executive Board meetings and at other times (342, 343) said many times (speaking of Farowitz): "I'll take care of that little prick." (343) Manuti did not deny this fact. (420–432) Although Manuti may have disqualified himself on certain appeals from the Local 802 Trial Board (422) pursuant to a By-Law permitting but not requiring such disqualification (423, 424), there was no proof that any such custom of Manuti was brought to the attention of plaintiff. (425) The reports of official proceedings of the AFM Executive Board do not show when a member declines to sit (426, 427) and no reports are distributed to members of the Local. (428)

23. In 1963, Farowitz, Alfred Nana, Bob Dorough and Hal Lansbury, members of Local 802, were convicted by the union of playing with an expelled member (Peterson). The fine of Farowitz was $150; Nana, $250; Dorough, $150; Lansbury, $150. On appeal to the AFM, Nana's fine was reduced to $150; Lansbury's to $50; Dorough's to $50, but plaintiff's remained at $150. (349–352) On this appeal Farowitz received no information that Manuti would withdraw from the AFM Appeal Board. (454)

24. In September 1962, the defendant Local 802 and the AFM filed an appeal from the district court's decision in Carroll v. Associated Musicians of Greater New York, 206 F.Supp. 462 (S.D. N.Y.1962). In the joint appeal brief of the Federation and Local 802 as appellees, filed October 1, 1962, counsel for appellants wrote in part:

"The Local Tax is 'payable and collected from all members * * * on all engagements based on the scale price therefor * * *.' The orchestra leader as a member of Local 802 is responsible for collecting and transmitting the Local Tax of 1½%." (p. 4)

"The Leader, in Collecting and Transmitting the Local Tax and

Travelling Surcharge, is Carrying Out His Obligations as a Member of the Appellee Unions. In So Doing, Neither the Leader who Makes the Payment nor the Appellee Unions which Receive the Payments Violate Section 302." (p. 24)

We also note that the actions in this court brought against Local 802 taxes were universally defended not only by Local 802 but by counsel for the Federation who bore the laboring oar of the defense.

## PARTICIPATION IN THE ACTION BY AN INTERESTED EMPLOYER
### 29 U.S.C. § 411(a) (4)

25. Peterson's corporation is an employer of musicians in the single engagement field. (86–87, 91, 186) Ben Cutler and Joesph Carroll are also employers of musicians in the single engagement field. (93, 185–186, 362) The National Association of Orchestra Leaders (hereinafter "NAOL") is an association of orchestra leaders, of which Ben Cutler is the President, Joseph Carroll is the Secretary, and Charles Peterson is the Treasurer. (105–106, 126, 137) Peterson, Carroll and Cutler have brought actions against the defendant Local 802 in this court attacking the Local's 1½% tax (see decisions referred to in stipulation at 364–365).

26. In a leaflet dated June 6, 1964 over the name, "Ben Cutler President, National Association of Orchestra Leaders," it was stated that "When AFM Local 802 expelled sideman Milton Farowitz, we and our attorney took up the fight and Judge Levet found, and the Circuit Court of Appeals affirmed, Farowitz' right of free speech and issued a protective injunction." (Ex. B) Cutler did not participate in formulating the language of the leaflet, but did discuss it preliminarily with Carroll and Peterson. (105–108) Carroll and Peterson wrote it, including the sentence relating to Farowitz. (125, 127)

27. Cutler had nothing to do with bringing the present action (117) or paying any part of Schmidt's fee. To his knowledge the NAOL paid nothing to Schmidt on account of this action. (118)

28. Farowitz made various disbursements in this action for bond premiums, printing bills, etc. totalling $221.10. (145–148; Exs. 11, 12, 13, 14, 15, 19) He had no knowledge of anyone else paying any bills or fees for the prosecution of this suit and no one had offered to pay them. (148) Farowitz did not pay any fee to Mr. Schmidt, his attorney (244, 245, 246), nor did he know of anyone who paid anything on his behalf to Mr. Schmidt. (246) No one contributed to his disbursements, except $3 to $5 for one Samuel Kramer, a sideman. (247) Farowitz denied that he was getting any support from Peterson (457) or any other employer or employer organization. (133–135)

29. Peterson conferred with Farowitz before he (Farowitz) began this action but Peterson did not remember when or where, and did not recall what he said. (129, 130, 131) Later, he said these conversations concerned his own suit involving the Local 802 tax, 62 Civil 2552 but he did not recall any details. (132, 133) Farowitz asked for no money for attorney's fees or expenses and Peterson did not say that he would pay any money for expenses. (133, 134)

30. Farowitz asked Peterson about having Schmidt represent him but Peterson did not recall what he said in answer. Peterson did not go to Schmidt's office with Farowitz. (135) As Treasurer of the NAOL, Peterson paid out no money in Farowitz' case. (137)

31. A $25 check of the Peterson corporation, dated April 29, 1963, the day on which this action was instituted, was made out to cash by Peterson (as President) (Ex. C) and cashed by him. (121, 122) The check bears the notation: "Legal Filing Fee Farrow-Loc. 802." (305) The notation on the check stub reads: "Legal Fees Milt Farrow vs Loc. 802." (Ex. D) The check was signed, endorsed and cashed by Peterson. (122) Plaintiff does not remember paying his filing fee. (248)

32. Peterson did not file the summons and complaint and was not there when it was filed. (306) He did not give the cash to Farowitz. (123) Farowitz did not ask Peterson for a contribution nor discuss legal fees. (124) Peterson at first did not recall whether he gave any of the money to Mr. Schmidt or why he cashed the check rather than making it payable directly to someone. (304) Nobody asked Peterson to provide $25 for filing fees, although he said it could be that "Mr. Schmidt called and said he needs money for advances in the many litigations—this might have been one of these litigations." Peterson indicated that this meant money for litigations of the NAOL. (307)

33. Peterson sat at the counsel table with plaintiff and conferred with and aided counsel for plaintiff. (139) Carroll and Cutler were present and active to a lesser degree. Farowitz did not ask them to be present and before the trial did not know that they would be present. (187–188)

34. The attorney for the plaintiff in this action has been and still is the attorney for Peterson, Carroll and Cutler in their court actions against the defendant Local 802.

### REVENUE FROM 1½% TAX

35. At all times relevant here, the Local's 1½% tax constituted a substantial part of the revenue of Local 802. (397, 266, 268–269) In 1961, Local 802 received $571,000 from the 1½% tax and in 1962, $489,000. (397) In 1961, approximately $122,000 of the $571,000 was collected from the single engagement field. (413) No figures of single engagement collections of this tax for 1962 were submitted. (414) However, in 1961, this tax was collected by and paid by the leaders. (412) In 1962, this method collapsed. The Cutler decision and the union attempts to comply with it caused Local 802 to change the method. (416)

### ATTEMPTS TO OBTAIN WORK

36. As a direct result of plaintiff's expulsion from Local 802 and of the publication of plaintiff's name as an expelled member, plaintiff lost employment as a musician in the single and steady engagement fields which resulted in damage to him. (10–19, 42–43, 48, 60–61, 64, 320, 326, 328) Orchestra leaders refused to employ plaintiff as a sideman. (71–75, 93–94, 96, 98) Sideman refused to work with plaintiff or under plaintiff's direction when plaintiff acted as an orchestra leader. (74, 315–320, 326, 328, 329) This is sustained by the following testimony:

(a) After plaintiff's expulsion from Local 802 he called various orchestra leaders, including Steiner, Kogar, Silvers, Palmer, Bender, Margel, Thaler, Goldberg, Cutler, Peterson and Hauseman, in quest of a job. He was unsuccessful. (42, 43) He also visited the union's exchange floor where workers and employers met. (43, 44) In October 1964, when there, one Benjamin Schwartz, sergeant-at-arms for the union, and one Max Raubel, business agent, in spite of the preliminary injunction told Farowitz that Manuti, President of the Local, had ordered them to put him, Farowitz, off the exchange floor. Rather than start a "fight," he left. (44, 45)

(b) Charles Peterson, an orchestra leader until expelled by Local 802 in March 1961, now operates a corporation known as Charles Peterson Theatrical Productions, Inc. which engages in entertainment, music and booking. (69) Peterson knew Farowitz many years ago. (70) In the middle of 1962, Peterson's corporation employed Farowitz as an orchestra leader twelve times and paid him for his services and that of his orchestra. (71, 72)

In January 1963, several sidemen telephoned Peterson and said that they would not work under the direction of Farowitz as a leader at an engagement planned by Peterson's company. (77, 78) Accordingly, Peterson cancelled the engagement with Farowitz and declined to hire him for any future engagements. (74) He told Farowitz the reason and didn't use him thereafter. (75)

(c) Ben Cutler, an orchestra leader in both the single and steady engagement field (93) received an application from Farowitz in 1964 for employment as a musician. (94) Because, as a member of Local 802 and of the AFM, Cutler was not permitted under the By-Laws of the union to employ a musician who was not a member (95), Cutler declined to employ Farowitz and so informed him. (96) Cutler knew about Farowitz' removal from the union through the publication in "Allegro." (97) However, Cutler did not know of the preliminary injunction issued against the union in favor of Farowitz. (101)

(d) Jessie Starr, a salesman and also a musician, performs as a sideman. (314) In 1963, after the expulsion of Farowitz, Starr refused to work for plaintiff (316) because of the union rule prohibiting working with a non-member. (318, 319) Starr had read the notice in the union paper about the expulsion of Farowitz. (319)

(e) Russell Dunn, a saxophone player (325) and member of Local 802 (326), was asked to work under Farowitz shortly after November 15, 1962. (327) Dunn refused, telling Farowitz that he could not work with him because he (Farowitz) was out of the union. (328)

(f) Since November 14, 1962, Farowitz has been employed sporadically on what are known as single engagements (6) for various employers. (7, 8, 9)

### DAMAGES

37. In 1960, plaintiff earned $1,560.50 as a musician (Ex. 38) and in 1961, $3,-392.50 (Ex. 39). In 1962, the year in which he was expelled from the union on November 14, 1962, plaintiff earned $3,-413.00. (Ex. F) In the two years after his expulsion plaintiff's earnings were as follows: 1963, musician's income, $2,-523.42; Fuller Brush salesman, $1,540.00 (Ex. 34); 1964, insurance agent, $8,-019.31. (Ex. 35)

38. Plaintiff is, therefore, entitled to compensatory damages of $1.00.

39. The officers of Local 802 acted with malice or reckless indifference

to plaintiff's rights. The union officers disliked Farowitz, treated him as a special case and were especially severe in penalizing him. (Findings of Fact Nos. 17, 20, 21, 22, 23) I award plaintiff $1,000 in punitive damages.

### DISCUSSION

### I. FREEDOM OF SPEECH

In acting as he did, Farowitz was within his right "to express any views, arguments, or opinions," if the union was not thereby precluded from enforcing "reasonable rules as to the responsibility of every member toward the organization as an institution" and if his conduct did not interfere with the union's legal or contractual obligations. 29 U.S.C. § 411(a) (2).

No proof has been offered of interference with contractual or legal obligations. Is it a reasonable rule enforcing responsibility toward the union as an institution that precludes dissenting views as to revenue questions? I do not so find.

Chief Judge Lumbard of this circuit in 1963 stated:

"The LMRDA of 1959 was designed to protect the rights of union members to discuss freely and criticize the management of their unions and the conduct of their officers. The legislative history and the extensive hearings which preceded the enactment of the statute abundantly evidence the intention of the Congress to prevent union officials from using their disciplinary powers to silence criticism and punish those who dare to question and complain. The statute is clear and explicit. * * *" Salzhandler v. Caputo, 316 F.2d 445, 448–449 (2d Cir. 1963).

As Judge Lumbard emphasized in Salzhandler, supra: "It would seem clearly in the interest of proper and honest management of union affairs to permit members to question the manner in which the union's officials handle the union's funds and how they treat the union's members." (p. 450) "The Congress has decided that it is in the public

interest that unions be democratically governed and toward that end that discussion should be free and untrammeled and that reprisals within the union for the expression of views should be prohibited." (p. 451)

The Court of Appeals of this circuit has already indicated its opinion of the very issue before the court in passing on the appeal from the preliminary injunction issued by the District Court. Farowitz v. Associated Musicians of Greater New York, 330 F.2d 999 (2d Cir. 1964). The relevant facts have not materially varied now that the trial has taken place. Chief Judge Lumbard wrote in part:

"* * * Local 802's contention here that Farowitz misrepresented the tenor of the Carroll decision of the district court with a design to undermine the union's very existence is unsupported by the facts. The leaflet Farowitz distributed on its face did no more than conclude from the Carroll decision and the union by-laws that no permissible method of collecting the tax remained. This was not an unreasonable reading of the by-laws in the light of the district court ruling that orchestra leaders who were not sidemen could not be required to collect the 1½ percent tax. In urging that the membership refuse to pay the tax Farowitz was suggesting one rational method of testing its validity and forcing an alteration in union policy, such as an amendment of the by-laws which might provide for a proper means of collecting the dues or taxes from the membership.

"* * * *

"Thus it is clear that here, as in Salzhandler, the elements of the proviso to § 101(a) (2) are not satisfied. A rule which subjects a member to expulsion for complaining of a tax which he reasonably believes to be illegal is not a reasonable rule. A member's responsibility to his union as an institution surely cannot include any obligation that he sit idly by while the union follows a course of conduct which he reasonably believes to be illegal because of what a court of law has stated." p. 1002.

It is clear that the expulsion of Farowitz for the distribution of his handbill, "They are Unlawful," violated plaintiff's rights under 29 U.S.C. § 411(a) (2).

## II. RIGHT TO SUE

A. *Exhaustion of Intra-Union Remedies.*

29 U.S.C. § 411(a) (4) guarantees plaintiff's right to sue "provided that * * * [he] *may* be required to exhaust reasonable hearing procedures" beforehand. Internal appellate procedures are not made an absolute requirement. This provision has been construed by Chief Judge Lumbard of this circuit in Detroy v. American Guild of Variety Artists, 286 F.2d 75 (2d Cir. 1961), cert. denied, 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388, as follows:

(1) The member who attempts to institute proceedings before a court (or an administrative agency) *may* be required to exhaust internal remedies of less than four months duration before invoking outside assistance (p. 78);

(2) The federal courts may develop their own principles regarding the time when a union's action taken in violation of Section 101 is ripe for judicial intervention (p. 78);

(3) The preferred tack is to consider each case on its own facts (p. 79);

(4) "[I]f the state of facts is such that immediate judicial relief is warranted, Congress' acceptance of the exhaustion doctrine as applied to the generality of cases should not bar an appropriate remedy in proper circumstances." (p. 79)

In a number of cases the federal courts have declined to require exhaustion of internal remedies. Detroy v. American Guild of Variety Artists, 286 F.2d 75 (2d Cir. 1961), cert. denied, 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388 (1961); Farowitz v. Associated Musicians of Greater New York, 330 F.2d 999 (2d Cir. 1964); Parks v. International Brother-

hood of Electrical Workers, 314 F.2d 886 (4th Cir. 1963); Calagaz v. Calhoon, 309 F.2d 248 (5th Cir. 1962); Burris v. International Brotherhood of Teamsters, etc., 224 F.Supp. 277 (W.D.N.C.1963).

In Calagaz, supra, 309 F.2d at 260, Circuit Judge Wisdom wrote: "The plaintiffs are not compelled to exhaust the internal remedies of their union when their appeal would have to be made to the very officers against whom their complaint is directed. Steele v. Louisville & Nashville Railroad Co., 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173."

In Parks, supra, 314 F.2d at 924–925, Chief Judge Sobeloff wrote: "Plaintiffs' failure to appeal to the Convention did not bar disposition of the cases by the District Court. Although there is a common law doctrine that parties are not entitled to judicial relief until they have exhausted intra-union remedies, there are a number of well-recognized exceptions 'which have substantially qualified if not nullified the rule.' Exceptions are recognized when resort to the internal appeal would be unreasonably burdensome because of delay likely to result in irreparable injury."

In the appeal from the preliminary injunction granted herein by the trial court, Judge Lumbard, while stating that the trial court had explicitly retained for trial the question whether further intra-union proceedings would be futile (330 F.2d p. 1003), remarked: "[I]t is clear that where there is reason to believe that resort to an appeal within the union would be a futility it is not necessary to follow such a course as a prerequisite to legal action." (p. 1002)

These views are in accord with those of Representative Griffin, one of the authors of the bill. He said, in discussing the proviso of Section 101(a) (4):

"* * * by use of the phrase 'reasonable hearing procedures' in the proviso, it should be clear that no obligation is imposed to exhaust procedures where it would obviously be futile or would place an undue burden on the union member." 105 Daily Cong.Rec.App. A 7915 (Sept. 4, 1959).

It is evident from the facts before me that plaintiff's appeal to the Executive Board of AFM would have been a futile action:

First, Farowitz was regarded as an "exceptional" threat to the union. (Findings Nos. 17, 20, 21)

Second, Manuti, a member of the Executive Board, had an intense personal dislike for Farowitz. (Finding No. 22)

Third, Farowitz was treated very severely in the past by the union when brought up on charges. (Findings Nos. 17, 21, 23)

Fourth, the members of the Executive Board had an interest in the outcome of the litigation since any lessening of union revenues might have its most immediate effect on the number and salaries of union executives. The Appeal Board here would have been the accusers, interested parties and at the same time the judicial tribunal.

Fifth, the Local's tax and a comparable measure of the parent Federation had been challenged directly in five suits[4] brought in this court, one of which has some 76 intervenors in addition to the original seven plaintiffs (62 Civ. 2552). Indirectly the taxes have been involved in this case and in Carroll v. Associated Musicians of Greater New York, 62 Civ. 4191, 235 F.Supp. 161. Collectively these actions have occasioned 13 appeals to the Court of Appeals.[5] In view of this extraordinarily litigious history, it would not be surprising if a harried Executive

---

4. Carroll v. Associated Musicians of Greater New York, 60 Civ. 1169, 60 Civ. 2939, 60 Civ. 4025 and 60 Civ. 4926 (D.C., 206 F.Supp. 462, 35 F.R.D. 535); Cutler v. American Federation of Musicians, 62 Civ. 2552 (D.C., 231 F.Supp. 845).

5. Docket Nos. 26278 (2 Cir., 284 F.2d 91 (1960)); 27013–16 (2 Cir., 295 F.2d 484 (1961)); 27769–72 (2 Cir., 316 F.2d 574 (1963)); 27844–45 (2 Cir., 310 F.2d 325); 27946 (2 Cir., 316 F.2d 546 (1963)); 28163 (appeal dismissed April 24, 1963).

908

Board had developed a hardened position toward critics of taxes.

■ Under these conditions, therefore, plaintiff need not exhaust internal union remedies which in this instance would have been clearly futile and unwarrantedly dilatory.

*B. Employer Interest.*

Another proviso to the guarantee of an employee's right to sue is "that no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action. * * *" 29 U.S.C. § 411(a) (4).

Congressman Griffin said regarding the purpose of this clause:

"The last proviso in Section 101 (a) (4) was added to make sure that the interested employers do not take advantage of rights accorded union members by encouraging or financing harassing suits or proceedings brought by union members against their unions. The purpose of the proviso should be kept in mind and it should not be so narrowly construed as to impose unnecessary or unintended restrictions upon employers in relationship with their employees." Cong.Rec.App. A 7915 (Sept. 10, 1959).

It was noted on several occasions that no definition of "interested" was supplied for the statute. Cong.Rec. 9109 (Sen. June 8, 1959), 14227 (House, Aug. 11, 1959).

■■ As a proviso, this clause must be strictly construed. Spokane & Inland Empire R. R. Co. v. United States, 241 U.S. 344, 350, 36 S.Ct. 668, 60 L.Ed. 1037 (1915); United States v. Dickson, 40 U.S. (15 Pet.) 141, 165, 10 L.Ed. 689 (1841). "[A] proviso states an exception from the general policy which a law embodies, and should be strictly construed and so interpreted as not to destroy the remedial processes intended to be accomplished by the enactment." Shilkret v. Musicraft Records, 131 F.2d 929, 931 (2d Cir.) cert. denied, 319 U.S. 742, 63 S.Ct. 1030, 87 L.Ed. 1699 (1942). This

language must be given a construction as consistent as possible with the policy of the statute to guarantee the right of union members to sue the union. The party relying on the proviso has the burden of establishing its applicability. United States v. Dickson, supra at 165; Jones v. H. D. & J. K. Crosswell, Inc., 60 F.2d 827, 829 (4th Cir. 1932). To exploit this proviso as a defense, therefore, defendant must sustain the burden of proving that certain employers, i. e., Cutler, Carroll and Peterson, were "interested" and that they encouraged, participated in or financed Farowitz' suit.

■ The first question is whether Carroll, Cutler and Peterson are interested employers. They have been the moving force in a multiplicity of suits against Local 802 and the AFM directed to invalidating the Local tax and other union practices. However, I find that this is insufficient to establish them as "interested employers" within the statute.

Farowitz has brought the present action to win reinstatement to the union and for damages. What is at stake in this case is his career and livelihood as a musician; Carroll, Cutler and Peterson have no interest in these things. The satisfaction they might feel or the incidental propaganda benefit that might accrue to them in their running dispute with the union, if the union lost the case, does not rise to the interest necessary to nullify the general policy of the statute and destroy Farowitz' otherwise meritorious cause of action. Moreover, the validity of the union taxes which Carroll, Cutler and Peterson are interested in have been resolved in other suits.

The question of whether Farowitz' suit was encouaged, participated in or financed by employers will be examined, although the conclusion that the employers in issue are not "interested" precludes its relevance as a defense even if established. Although the testimony of Carroll, Cutler and Peterson was noncommittal, Peterson's check recorded as a legal filing fee in this case by Peterson and dated the day the complaint was filed, the fact that Farowitz' lawyer is counsel

for Carroll, Cutler and Peterson in their various suits against Local 802 and the AFM, the preparation of a leaflet by Carroll and Peterson stating that their organization, the NAOL, "and attorney took up [Farowitz'] fight," and their presence and participation in the trial other than as witnesses, suggests that they may have participated in, encouraged or financed the action.

The record is lacking, however, in any evidence to show that Farowitz was aware of their participation other than their actual presence at trial. Further, Cutler, Carroll and Peterson were witnesses in the action and had to be present at trial part of the time. In the absence of knowledge on the part of Farowitz that they were aiding in the prosecution of this suit, I cannot conclude that his right to sue would be imperilled by anything they did. This is consistent with the policy of construing provisos strictly to preserve the general policy of the enacting clause of the provision.

In conclusion, the plaintiff has suffered a substantial wrong against which there is no valid defense. He is entitled to pursue music as a career if he wishes without interference with his right of free speech.

## III. DAMAGES

■ Plaintiff has been awarded the nominal sum of $1.00 in compensatory damages. Punitive damages may be awarded if actual malice or reckless or wanton indifference to the rights of plaintiff existed. Reynolds v. Pegler, 123 F. Supp. 36 (S.D.N.Y.1954), aff'd, 223 F.2d 429 (2nd Cir.), cert. denied, 350 U.S. 846, 76 S.Ct. 80, 100 L.Ed. 754 (1955).

■ There is controversy in some jurisdictions as to whether punitive damages can be assessed where no actual damages have been allowed. Oleck, Damages to Persons and Property 560.8 (Red. ed. 1961). However, in the Second Circuit it is clear that punitive damages may be allowed where there has been an award of only nominal compensatory damages. Reynolds v. Pegler, 223 F.2d at 434.

Traditionally, a court of equity is not empowered to grant exemplary damages. Coca-Cola Co. v. Dixi-Cola Laboratories, Inc., 155 F.2d 59 (4th Cir.), cert. denied, 329 U.S. 773, 67 S.Ct. 192, 91 L.Ed. 665 (1946); Dunkel v. McDonald, 272 App. Div. 267, 70 N.Y.S.2d 653 (1947), aff'd, 298 N.Y. 586, 81 N.E.2d 323 (1948); cf., Aladdin Mfg. Co. v. Mantle Lamp Co., 116 F.2d 708 (7th Cir. 1941). There are dissenting views, however. Oleck, supra at 542. Furthermore, the merger of law and equity has erased some of the limitations in this regard.

In granting punitive damages this court would be acting under the LMRDA, 29 U.S.C. §§ 411, 412. The precise remedies available to a plaintiff under these sections are not made explicit. It is certain that an injunction and compensatory damages are included. Whereas an injunction is an equitable remedy, I cannot conclude that the cause of action is thereby made exclusively equitable. It partakes of law as much as equity. In any event, in view of the merger of law and equity, it should not be necessary to dissect a recent statute and characterize it as one or the other.

I conclude that punitive damages may be awarded under the LMRDA, 29 U.S.C. § 411.

### CONCLUSIONS OF LAW

1. The court has jurisdiction of the subject matter and the parties hereto by reason of Title I of the LMRDA, 29 U.S.C. §§ 411(a) (2), (4).

2. The defendant's expulsion of plaintiff from membership in Local 802 was a violation of plaintiff's right of free speech and free expression of opinion. 29 U.S.C. § 411(a) (2).

3. Plaintiff was within the right to sue protected by 29 U.S.C. § 411(a) (4) in bringing this action.

4. The plaintiff is entitled to $1.00 in compensatory damages.

5. The plaintiff is entitled to $1,000 in punitive damages.

6. Plaintiff, having been unlawfully expelled from the union and denied the right of free speech guaranteed to him

by the statute, is entitled to an order directing the defendant union to reinstate him to membership forthwith and to expunge from its records and dismiss all charges against him, and to an order enjoining permanently the defendant union, its officers, agents, servants and members from interfering directly or indirectly with the plaintiff in his right to speak, publish and disseminate his views on union matters. There is no adequate remedy at law.

7. Plaintiff is entitled to judgment with costs for the relief hereinabove stated.

Submit judgment on notice.